Teague I. Donahey (ISB #9963)
tidonahey@hollandhart.com
Christopher C. McCurdy (ISB #8552)
ccmccurdy@hollandhart.com
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-7714
Telephone: +1 208.342.5000

Jared Bobrow (*pro hac vice forthcoming*)
jbobrow@orrick.com
Jason Lang (*pro hac vice forthcoming*)
jlang@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650.614.7400
Facsimile: +1 650.614.7401

Attorneys for Plaintiff
MICRON TECHNOLOGY, INC.

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| MICRON TECHNOLOGY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>YANGTZE MEMORY TECHNOLOGIES CO., LTD., and HONGBIN ZHU,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS, DECLARATORY JUDGMENT, AND BREACH OF CONTRACT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**PUBLIC REDACTED VERSION** |

Plaintiff Micron Technology, Inc. ("Micron") brings this action against defendants Yangtze Memory Technologies Co., Ltd. ("YMTC") and Hongbin Zhu ("Defendant Zhu") as follows.

## I. NATURE OF THE ACTION

1. This action arises from the intentional and systematic misappropriation of Micron's trade secrets ("Micron's Trade Secrets" or "Trade Secrets") and other highly confidential information relating to the commercial-scale fabrication of advanced three-dimensional ("3D") NAND memory devices by YMTC and former Micron employees, including Defendant Zhu, who, while at Micron or after leaving Micron, acted as agents, employees, or representatives of YMTC.

2. YMTC targeted Micron's Idaho-based workforce directly or through recruiting agents acting on its behalf and targeted additional former Micron employees who accessed Micron Trade Secrets and confidential information stored on servers in Boise. Once recruited, YMTC used Defendant Zhu and other former Micron employees for access to Micron's Trade Secrets and confidential information for YMTC's benefit to jumpstart and advance its fabrication of advanced 3D NAND memory devices with a large number of memory layers and high-aspect-ratio features—both of which are essential to the fabrication of such memory devices. The former Micron employees each owed Micron duties of confidentiality that continued after termination of their employment and prohibited them from using, disclosing, or improperly possessing Micron's Trade Secrets and confidential information. They did not honor those obligations.

3. Once working for YMTC, Defendant Zhu and the other former Micron engineers implemented technical solutions for YMTC that were based, at least in part, on their knowledge and use of Micron's Trade Secrets and confidential information. These solutions relate to 3D

NAND flash memory devices and DRAM devices, which are data storage chips found in electronic devices like USB drives, solid-state drives (SSDs), smartphones, digital cameras, and servers. The solutions include: processes for implementing replacement gate technology to increase the number of layers in a 3D memory stack; masking configurations for etching high-aspect-ratio holes through 3D memory stacks having a large number of layers; processes for connecting operative structures of a 3D NAND memory in an array having a large number of layers; processes for maintaining the proper shape of features of 3D NAND memory devices during the fabrication process; processes for properly forming operative structures with the proper operative shape and highly conductive surfaces for high-aspect operation; techniques to adjust operational voltages for more accurate and efficient access operations; and circuitry for the data input-output path for memories (e.g., 3D NAND and DRAM devices).

4. On information and belief, YMTC used Micron's Trade Secrets and confidential information to design, develop, and refine its 64-layer, 128-layer, and 232-layer 3D NAND (and later generations) devices.

5. YMTC knew or should have known that the solutions provided by Defendant Zhu and the other Micron former engineers were based on Micron's Trade Secrets and confidential information, yet it accepted the benefits of those solutions by incorporating them into its products and filing patent applications using such information. Specifically, YMTC had Defendant Zhu and the other former Micron engineers file and assign patent applications that relate to the subject matter of Micron's Trade Secrets and confidential information. As described further below, the subject matter of these patent applications, together with the circumstances discovered through Micron's investigation that began in and after November 2023, indicate that YMTC has received and used Micron's Trade Secrets and confidential information and has

incorporated Micron's technical solutions into YMTC's operations, patent portfolio, processes, and products, thereby gaining an improper advantage and engaging in unfair competition.

6. Micron only became aware of the circumstances indicating Defendants' misappropriation after YMTC initiated litigation against Micron in the United States District Court for the Northern District of California in November 2023. In preparing its defense, Micron's investigation revealed that a number of former Micron engineers were listed as inventors on the patents asserted by YMTC, including Defendant Zhu. In another litigation initiated by YMTC in the United States District Court for the Eastern District of Texas on October 6, 2025, Micron's investigation revealed that former Micron engineer Song was listed as an inventor on a patent asserted by YMTC.

7. Notably, Micron's investigation revealed that for a number of patents that YMTC asserted against Micron, Micron was the true owner of the patents. This is because while these patents purportedly identify YMTC inventors, those alleged inventors are former Micron engineers, and the patents claim inventions, discoveries, ideas, processes, developments, concepts, and/or improvements that were made, created, developed, written, and/or conceived by teams of Micron engineers that included the alleged YMTC inventors during their employment by Micron. By virtue of assignment agreements between the former Micron engineers and Micron, the former Micron engineers had assigned all right, title, and interest in the claimed inventions to Micron. These former Micron engineers include Defendant Zhu and Song.

8. Micron's further investigation revealed that certain patent applications filed by or assigned to YMTC relate to the subject matter of Micron's Trade Secrets and confidential information. The subject matter of these patent filings, combined with the results of Micron's investigation following YMTC's November 2023 infringement complaint, collectively indicate

that YMTC has been using Micron's Trade Secrets. At the time of their departure, Micron had no reason to suspect YMTC was using Micron's former engineers to acquire Micron's Trade Secrets and confidential information, particularly because several of the engineers cited personal or family reasons for their resignations and did not update their LinkedIn profiles to reflect their new roles at YMTC. Moreover, at the time of the engineers' departures, Micron had no reason to suspect YMTC itself of seeking to misappropriate Micron's Trade Secrets and confidential information, particularly as YMTC did not have any material market share in the industry.

9. YMTC was founded in 2016, and began mass production of its 64-layer 3D NAND chips around September 2019.[1] YMTC skipped production of a 96-layer 3D NAND chip[2] and moved directly to mass production of a 128-layer 3D NAND chip around July 2021,[3] only two years after beginning mass production of its 64-layer NAND chip. YMTC, likewise, skipped production of a 176-layer chip and, ahead of some in the industry, announced the development of a 200+-layer 3D NAND chip.[4]

---

[1] *Yangtze Memory Begins Mass-Production of 64-Layer 3D NAND Flash Memory*, TECHPOWERUP (Sept. 3, 2019, 3:25 AM), https://www.techpowerup.com/258862/yangtze-memory-begins-mass-production-of-64-layer-3d-nand-flash-memory [https://perma.cc/C2XR-HPNM].

[2] *YMTC Launches 128-Layer 3D NAND Flash Memory Chip*, TECHPOWERUP (Apr. 13, 2020, 2:49 am), https://www.techpowerup.com/265699/ymtc-launches-128-layer-3d-nand-flash-memory-chip [https://web.archive.org/web/20200601071528/https://www.techpowerup.com/265699/ymtc-launches-128-layer-3d-nand-flash-memory-chip].

[3] *Chinese Chipmaker YMTC's 128-Layer Memory Chip Achieves Mass Production*, GLOBAL TIMES (July 30, 2021, 1:22 am), https://www.globaltimes.cn/page/202107/1230069.shtml [https://perma.cc/VS25-2GJZ].

[4] *YMTC 232L TLC 3D NAND (YMTC 4th Gen, Xtacking 3.0, Parent Product: HikSemi CC700 2 TB SSD), Disruptive Event Briefing*, TECHINSIGHTS (Nov. 2022), https://www.techinsights.com/sites/default/files/2022-11/TechInsights-DE-YMTC-232L-FINAL.pdf [https://perma.cc/THS5-YMVW].

10. On information and belief, YMTC is planning to enter the DRAM market as well.[5]

11. As noted previously, Micron later learned that YMTC is not the rightful owner of all the patents that it was filing while developing its 64-, 128-, and 200+-layer 3D NAND chips (and its alleged upcoming DRAM products), because YMTC had been filing patents using purported inventors that were former Micron engineers and, by virtue of assignment agreements between the former Micron engineers and Micron, the former Micron engineers had assigned all right, title, and interest in the claimed inventions to Micron.

12. Micron seeks injunctive relief, damages, and a declaration of patent ownership to remedy Defendants' unlawful conduct and protect Micron's intellectual property and position in the market.

## II. THE PARTIES

### A. Plaintiff Micron

13. Micron is a Delaware corporation with a principal place of business at 8000 South Federal Way, Boise, Idaho 83716. Micron is a citizen of Delaware and Idaho pursuant to 28 U.S.C. § 1332(c)(1). Micron was founded in 1978 and is headquartered in Boise, Idaho, where it established its first semiconductor fabrication facility. Micron is the only U.S.-founded semiconductor memory designer and manufacturer that currently manufactures advanced memory chips in the United States. Micron is a world leader in innovative computer-memory and data-storage solutions, employing over 6,900 people in Idaho and many more across the United States and globally.

---

[5] Che Pan & Fanny Potkin, *China Flash Memory Maker YMTC Plans to Enter the DRAM Market, Sources Say*, REUTERS (Sept. 24, 2025, 8:44 PM), https://www.reuters.com/technology/china-flash-memory-maker-ymtc-plans-enter-dram-market-sources-say-2025-09-25/.

14. In June 2025, Micron announced plans to invest approximately $200 billion in U.S. semiconductor manufacturing and R&D, including $150 billion for domestic memory manufacturing and $50 billion for R&D. Subsequently, in November 2025, the company reported that planning for its second Boise fabrication facility had advanced and ground preparation had commenced. This investment is designed to enhance domestic supply, provide domestic technology leadership, and meet anticipated AI-driven demand. Micron is moving forward with the Boise facility on an accelerated timeline, supported in part by federal CHIPS Act funding, underscoring the company's strong commitment to expanding U.S. semiconductor manufacturing and supply chain resilience. As of January 19, 2026, Micron Technology has also started construction on a new manufacturing facility in New York.

15. Micron has an expansive patent portfolio, which, over the company's history, reached 60,000 granted patents by 2025.

**B. Defendant YMTC**

16. YMTC is a semiconductor device manufacturer that produces 3D NAND memory chips. YMTC is headquartered in China and maintains a principal place of business in Wuhan, China. YMTC's headquarters is located at No. 88 Weilai 3rd Road, East Lake High-tech Development Zone, Wuhan, Hubei, 430205, China.

**C. Defendant Hongbin Zhu**

17. Zhu was employed by Micron as a Dry Etch Process Engineer and later as a Principal Process Integration Engineer at Micron's Boise, Idaho campus from January 9, 2006 to September 15, 2017. On information and belief, Defendant Zhu is a citizen of China.

**1. <u>Access to Trade Secret Information</u>**

18. While working for Micron, Zhu resided and worked in Idaho. Zhu had access to proprietary information regarding Micron's 100 (32-layer), 110 (64-layer), 120 (96-layer), 130

(128-layer), and 140 (176-layer) series 3D NAND technology nodes,[6] including access to Micron's Trade Secrets that were documented in materials stored on servers in Boise, Idaho from the following classes of Trade Secrets ("Trade Secret Classes"):

- Trade Secret Class No. 1: [redacted] hard mask and associated clean for etching high aspect-ratio features. *See infra* §IV.H.1.
- Trade Secret Class No. 2: [redacted] along with specific tool configuration, and adjustments to mechanical features and process, in the wet-nitride exhumation step. *See infra* §IV.H.2.
- Trade Secret Class No. 3: [redacted] CMP of inter-deck plugs. *See infra* §IV.H.3.
- Trade Secret Class No. 4: Nonconsumable liners for high-aspect ratio profile control. *See infra* §IV.H.4.
- Trade Secret Class No. 5: [redacted] cleaning during pillar formation. *See infra* §IV.H.5.
- Trade Secret Class No. 6: [redacted] bottom pillar sculpting. *See infra* §IV.H.6.

19. Zhu had access to the chip documentation, process flows, and recipes for Micron's 100, 110, 120, 130, and 140 series 3D NAND technology nodes. As such, Zhu likewise had access to Micron's Trade Secret Classes Nos. 1-6 via the chip documentation for Micron's 100, 110, 120, 130, and 140 series 3D NAND technology nodes.

---

[6] In 3D NAND technology, memory cells are stacked vertically in layers—increasing the number of layers increases the chip's memory capacity. Micron designates its successive generations of 3D NAND technology internally by series number, each of which corresponds to an increasing number of layers.

20. Further, Zhu was deeply involved in the development of Micron's Trade Secret Class Nos. 1 and 2 in connection with Micron's [redacted] 3D NAND technology node. Micron's Trade Secret Class No. 1 contributes to the ability to form high aspect ratio features in 3D NAND memory devices having a large number of layers. For example, Zhu authored "hzhu Bi-Weekly B37X PILLAR MODULE STATUS 2-8-17.pptx," which shows details of pillar etches, and authored "170313 NAND RG F2F_B37X_module_update_05_10_17.pptx," another example of a file showing details and processes for high-aspect-ratio feature formation, including memory pillars, slit structures, through-array vias, and support structures.

21. In addition, Zhu was integral in developing Micron's Trade Secret Class No. 3 as part of his work on Micron's [redacted] 3D NAND technology node. Defendant Zhu specifically worked on interconnection structures, and corresponding processing of those structures, between high aspect-ratio features, and developed target metrics for this process in the context of Micron's pillar processes.

22. Defendant Zhu worked on the development of Micron's [redacted] 3D NAND technology node, where he co-invented the concept of [redacted] This innovation is documented in Micron's Invention Disclosure, Docket No. 2013-0273 (Apr. 30, 2013) ("2013-0273 Invention Disclosure Form"). Micron [redacted]

23. In addition, Defendant Zhu was involved in the subject matter of Micron's Trade Secret Class Nos. 5 and 6 as part of his work on Micron's [redacted] 3D NAND technology node and the transition to Micron's [redacted] 3D NAND technology node, and had access to each

Trade Secret Class. Defendant Zhu specifically worked on [redacted]

### 2. Defendant Hongbin Zhu's Assignment Obligations and Post-Employment Conduct

24. In consideration of Micron providing employment to Defendant Zhu, Defendant Zhu owed Micron ongoing confidentiality obligations to keep its confidential and trade secret information confidential. Attached as Exhibit A is a true and correct copy of Defendant Zhu's Confidential Information and Nonsolicitation Agreement ("Zhu Confidentiality Agreement"). In addition, Defendant Zhu "assign[ed] and agree[d] to assign to Micron, or its designee, all of [his] right, title and interest in and to all inventions, discoveries, ideas, processes, works of authorship, mask works, drawings, logos, developments, concepts, and improvements…whether or not patentable, copyrightable, or subject to other forms of protection, made, created, developed, written, reduced to practice, or conceived by [him], in whole or in part, either solely or jointly with others, during the period of time [he is] in the employ of or providing service to Micron, whether during or outside of regular working hours." Attached as Exhibit B is a true and correct copy of the Assignment of Inventions and Rights Agreement between Hongbin Zhu and Micron ("Zhu Assignment Agreement").

25. During his employment in Boise, Idaho at Micron, Defendant Zhu had access to information about the development of Micron's 3D NAND technology, including confidential and proprietary information regarding the design and fabrication of advanced memory devices. Defendant Zhu was involved with, worked on, and jointly collaborated with other engineers at Micron on the development of Micron's 3D NAND products and related technologies.

26. On January 17, 2020, YMTC filed Patent Application No. 16/745,342, which claims priority to PCT/CN2018/101482, filed on August 21, 2018, and which issued as U.S.

Patent No. 11,049,866 (the "'866 Patent").[7] The '866 Patent names Defendant Zhu as an inventor and relates to technologies that Defendant Zhu learned of, worked on, and/or conceived while at Micron. Specifically, among other things, Defendant Zhu knew about, worked on, conceptualized, and/or jointly collaborated with other engineers at Micron on the development of a memory device (and method for forming such). This device includes a memory stack on the substrate, which contains interleaved conductive and dielectric layers. Etch technologies include the ability to form recesses and/or channel structures that extend vertically through the memory stack. Additionally, the memory stack contains through-array contacts (TACs) that extend vertically through the memory stack. The TACs include a conductor layer and a spacer.

27. On November 30, 2020, YMTC filed Patent Application No. 17/107,929, which claims priority to PCT/CN2018/101482, filed on August 21, 2018, and which issued as U.S. Patent No. 11,532,636 (the "'636 Patent").[8] The '636 Patent names Defendant Zhu as an inventor and relates to technologies that Defendant Zhu learned of, worked on, and/or conceived while at Micron. Specifically, among other things, Defendant Zhu knew about, worked on, conceptualized, and/or jointly collaborated with other engineers at Micron on the development of a memory device (and method for forming such) that includes a stack comprising interleaved dielectric and sacrificial layers above a substrate, channel structures extending vertically through the stack, a first opening extending vertically through the stack, etch technologies that form recesses, a spacer on a sidewall of the first opening, a TAC extending vertically through the stack that is formed by depositing a conductor layer over the spacer in the first opening, and a slit extending vertically through the stack (and forming the slit after the TACs).

[7] A copy of the '866 Patent is attached hereto as Exhibit E.
[8] A copy of the '636 Patent is attached hereto as Exhibit F.

28. On October 1, 2018, YMTC filed Patent Application No. 16/149,103, which claims priority to PCT/CN2018/101482, filed on August 21, 2018, and which issued as U.S. Patent No. 10,566,336 (the "'336 Patent").[9] The '336 Patent names Defendant Zhu as an inventor and relates to technologies that Defendant Zhu learned of, worked on, and/or conceived while at Micron. Specifically, among other things, Defendant Zhu knew about, worked on, conceptualized, and/or jointly collaborated with other engineers at Micron on the development of a memory device (and method for forming such) that includes a dielectric stack comprising a plurality of dielectric/sacrificial layer pairs on a substrate, a channel structure extending vertically through the dielectric stack, a first opening extending vertically through the dielectric stack, a spacer on a sidewall of the first opening, a TAC extending vertically through the dielectric stack that is formed by depositing a conductor layer in contact with the spacer in the first opening, a slit extending vertically through the dielectric stack (in which forming the slit occurs after forming the TAC), and a memory stack comprising a plurality of conductor/dielectric layer pairs on the substrate (and forming the conductive layers, e.g., tungsten, by replacing, through the slit, the sacrificial layers in the dielectric/sacrificial layer pairs with a plurality of conductor layers, e.g., tungsten layers).

29. The subject matter of the '866 Patent, the '636 Patent, and the '336 Patent, and Defendant Zhu's related work at YMTC, relate to the subject matter of at least some of the Trade Secrets and confidential information that Defendant Zhu accessed and/or developed during his employment at Micron, and which he was obligated to assign to Micron under the Zhu Assignment Agreement.

---

[9] A copy of the '336 Patent is attached hereto as Ex. G.

### 3. Defendant Zhu's Resignation from Micron and Joining YMTC

30. Defendant Zhu resigned from Micron effective September 15, 2017, citing the need to move closer to his aging father as the reason for his departure, as documented in his resignation form. On information and belief, Defendant Zhu has been (or was for several years) a YMTC employee or contractor since departing from Micron and had advanced quickly to senior leadership roles at YMTC. Despite leaving Micron, as of July 2026, Defendant Zhu's LinkedIn profile continues to list him as a Principal Process Integration Engineer at Micron from 2010 onward, with no mention of subsequent employment at YMTC or any other company.

31. It is unclear when exactly Defendant Zhu began working at YMTC. But Defendant Zhu began filing patents naming YMTC as the assignee starting June 29, 2018, within a year of his departure from Micron. In the more than a decade that Micron employed Defendant Zhu, he was a named inventor on approximately 68 unique Micron patent applications. In contrast, in his first two years of filing patents as an alleged inventor for YMTC, Defendant Zhu filed approximately 126 patent applications. As noted previously, despite YMTC purporting to be the assignee of these patents, by virtue of the Zhu Assignment Agreement between Defendant Zhu and Micron governing his work at Micron, Defendant Zhu had assigned all right, title, and interest in certain of these patents to Micron.

## III. JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction

32. This action arises under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*; the Idaho Trade Secrets Act, Idaho Code § 48-801 *et seq.*; and Idaho law.

33. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the claims arising under the DTSA.

34. Micron seeks declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 in connection with its claims arising under the DTSA.

35. The Court may also exercise supplemental jurisdiction over the claims arising under the Idaho Trade Secrets Act and Idaho law alleged in this Complaint pursuant to 28 U.S.C. § 1367.

36. In addition, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as to the claims against Defendant Zhu because Micron is a citizen of a state, and Defendant Zhu is a citizen or subject of a foreign state, and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

## B. Personal Jurisdiction

### 1. <u>Idaho Long-Arm Statute</u>

37. This Court has jurisdiction over Defendants for purposes of this action pursuant to Idaho Code § 5-514, because Defendants have committed tortious acts within this state, or directed at the state, either directly or through agents, as provided for in Idaho Code § 5-514(b).

### 2. <u>Due Process</u>

38. The Court's exercise of personal jurisdiction over Defendants is consistent with the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

39. Specifically, personal jurisdiction over Defendants is proper in this Court because their intentional acts were expressly aimed at Idaho, and Micron suffered harm in Idaho as a result of those acts.

### 3. <u>YMTC's Intentional Targeting of Micron and Idaho</u>

40. YMTC expressly aimed its conduct at Micron, a corporation headquartered in Idaho, by intentionally acquiring Micron's Trade Secrets and using them to gain an improper advantage to benefit its own position in the market. YMTC purposefully recruited and hired

individuals working at Micron and/or residing in Idaho to perform services on YMTC's behalf, demonstrating its intent to target members of Micron's workforce in Idaho. These individuals include Defendant Zhu—a former Micron employee—as well as former Micron employees Jun Liu, Yushi Hu, Qian Tao, and Changhyun Lee, all of whom resided in Idaho while they were working for Micron and while YMTC recruited them. Each of these employees owed Micron contractual obligations to keep trade secrets confidential, had access to certain of the Micron Trade Secrets further described below while employed at Micron, and on information and belief, each joined YMTC shortly after leaving Micron. Each of these employees also regularly accessed one or more of the Trade Secrets that were located on servers in Boise by accessing Micron's highly confidential technical materials relating to its test and/or production nodes.

41. Liu worked at Micron from September 3, 2002, to June 9, 2017, at Micron's Boise campus, including as a Principal Process Integration Engineer and a Senior Member of the Technical Staff (SMTS). While at Micron, Liu had access to proprietary information regarding Micron's [redacted] 3D NAND technology node, including Trade Secret Class Nos. 3 and 6.

42. Hu worked at Micron from June 27, 2011, to August 12, 2016, including as a Senior Engineer-NAND PI at Micron's Boise campus. While at Micron, Hu had access to proprietary information regarding Micron's [redacted] 3D NAND manufacturing nodes, including access to Trade Secret Class Nos. 1-3 and 5-6.

43. Tao worked at Micron from June 6, 2011, to May 2, 2017, including as a Senior Engineer-NAND PI at Micron's Boise campus. While at Micron, Tao had access to proprietary information regarding the [redacted] 3D NAND manufacturing nodes, including access to Trade Secret Class Nos. 1-3 and 5-6.

44. Lee worked at Micron from September 14, 2015, to October 23, 2019, including as Principal Engineer-NAND Cell at Micron's Boise campus. While at Micron, Lee had access to proprietary information regarding Micron's [redacted] 3D NAND manufacturing nodes, including access to Trade Secret Class Nos. 1-3 and 5-6.

45. In addition, YMTC reached into Idaho by its recruitment and hiring of other Micron engineers outside of Idaho that regularly accessed Micron's confidential and trade secret information that is stored on servers in Boise. For example, these individuals include Daesik Song, Wenxi Zhou, and Hua Tan. Each of these employees owed Micron contractual obligations to keep trade secrets confidential, had access to certain of the Micron Trade Secrets further described below while employed at Micron, and on information and belief, each joined YMTC shortly after leaving Micron. Each of these employees also regularly accessed one or more of the Trade Secrets that were located on servers in Boise by accessing Micron's highly confidential technical materials relating to its test and/or production nodes.

46. YMTC recruited Song. Song worked at Micron from December 8, 2008, to February 13, 2017, at Micron's San Jose, California campus, as a Principal Design Engineer. While at Micron, Song had access to proprietary information regarding Micron's [redacted] 3D NAND technology nodes, including Micron's early replacement gate research and development materials, and Micron's research into new input-output circuitry for memory devices (including Trade Secret Class No. 8, *see infra* §IV.H.8). Song worked with colleagues in Boise and, on information and belief, accessed confidential information and Trade Secrets that were stored on Micron's servers in Boise. Song was the author of "Serializer_improvement.pptx" that depicts a Micron low-power input-output circuit [redacted] which Micron maintained under strict confidentiality during development.

47. YMTC also recruited Wen Xi Zhou, a PI Section Manager who worked at Micron's Singapore campus from January 28, 2011, to December 31, 2018, and joined YMTC as an R&D Manager / Assistant Director in January 2019. While at Micron, Zhou had access to proprietary information regarding Micron's [redacted] 3D NAND technology node, including access to Trade Secret Class Nos. 3 and 6, worked with colleagues in Boise, and on information and belief, accessed confidential information and Trade Secrets that were stored on Micron's servers in Boise.

48. YMTC also recruited Hua Tan, a NAND Product, Verification, and Design Engineer who worked for Micron Technology (Shanghai) Co., Ltd. ("Micron China") at the Shanghai, China campus from September 28, 2015, to March 2021, and joined YMTC as a Storage System Architect also in March 2021. While at Micron, Tan had access to proprietary information regarding Micron's read-offset technology development and [redacted] 3D NAND technology node, including access to Trade Secret Class No. 7 (*see infra* §IV.H.7), worked with colleagues in Boise, and on information and belief, accessed confidential information and Trade Secrets that were stored on Micron's servers in Boise.

49. As Micron later learned, YMTC's hiring of Micron engineers was not random or coincidental, but rather part of a deliberate strategy to solicit and employ Micron employees—all while successfully concealing its actions. As set forth in further detail below, YMTC recruited and hired Micron employees with the intent to obtain Micron's Trade Secrets and confidential information. At least 20 employees left Micron over a few years to join YMTC, with many of them citing similar reasons for leaving, e.g., to take care of an aging or sick family member. Notably, a cluster of five employees departed Micron in mid-2017, and of those five, three from Micron's Boise campus—Defendant Zhu, Liu, and Tao—cited family reasons for leaving. On

information and belief, most of these employees joined YMTC before YMTC began volume production of its 64-layer 3D NAND chips.

50. In addition, on information and belief, YMTC went to great lengths to recruit the former Micron employees, including offering compensation and relocation packages and significant promotions designed to prompt rapid departures of Micron employees. On information and belief, YMTC's recruiters also instructed candidates what to say in exit interviews, including providing false or misleading reasons for their departure, so that Micron would not suspect wrongful conduct and YMTC's recruitment efforts would not raise suspicion (and as a result, Micron did not have reason to suspect wrongful conduct at the time).

51. YMTC targeted employees primarily from Micron's process and process integration ("PI") teams in R&D, especially those involved in the development of 3D NAND technology. These employees, including Defendant Zhu, Liu, Hu, Tao, and Lee, had access to Micron's Trade Secrets and confidential information via Micron's servers that were located in or accessed from Boise, Idaho. Many of the Micron engineers that YMTC recruited delayed updating their LinkedIn profiles or omitted their new employment entirely from their profiles. Notably, YMTC targeted groups of employees who had jointly filed patents, suggesting a focused effort to acquire teams with Micron's valuable know-how and intellectual property.

52. Micron did not, and had no reason to, suspect that any of the departing engineers had taken Micron's Trade Secrets or confidential information, or that any of these individuals would use them for YMTC's improper benefit. Further, at the time of these employees' departures, YMTC did not have any material market share in the industry.

53. Micron's former employees, including Defendant Zhu, Liu, Hu, Tao, and Lee, were subject to duties of confidentiality and nondisclosure to Micron, including confidentiality

obligations that survived their termination of employment. At least Defendant Zhu acquired and retained Micron's Trade Secrets and confidential information through improper means by wrongfully retaining the Trade Secrets in Idaho, and subsequently used or provided them for YMTC's benefit, in violation of his contractual obligations to Micron.

54. Upon joining YMTC, at least Defendant Zhu—and former Micron engineers Liu, Hu, Tao, and Lee—used at YMTC, and disclosed to YMTC, Micron's Trade Secrets for the benefit of YMTC and within the scope of his employment at YMTC. YMTC knowingly placed Defendant Zhu, Liu, Hu, Tao, and Lee in a position where they could utilize Micron's confidential information to advance YMTC's research and development. On information and belief, YMTC encouraged at least Defendant Zhu, Liu, Hu, Tao, and Lee to use Micron's Trade Secrets and provide them to YMTC. Specifically, YMTC directed at least Defendant Zhu, Hu, and Tao to file, among other filings, U.S. patent applications that relate to the subject matter of Micron's Trade Secrets and confidential information.

55. Alternatively, YMTC became aware, or should have become aware, that Defendant Zhu and/or other Idaho-based former Micron engineers whom YMTC recruited and hired were using or providing to YMTC Micron's Trade Secrets and confidential information, including in preparing YMTC's patent applications. Similarly, YMTC became aware, or should have become aware, that the non-Idaho-based former Micron engineers whom YMTC recruited and hired—including Song, Zhou, and Tan—had access to Micron's Trade Secrets and confidential information stored on servers in Boise, Idaho, and were using or providing such information to YMTC, including in preparing YMTC's patent applications. Micron's public SEC filings disclose that its corporate headquarters are located in Boise, Idaho, that Boise is Micron's largest R&D center, and that its process, design, and package development efforts are directed

from that center. Because YMTC specifically targeted Micron R&D engineers for recruitment, it knew or should have known that these engineers regularly accessed confidential technical information maintained on Micron's servers at its Boise headquarters—regardless of the campus at which they were physically located—and that the technical solutions these engineers provided to YMTC were derived from Trade Secrets and confidential information misappropriated from those Boise-based servers. YMTC ratified this conduct by accepting the benefits of the misappropriated information, failing to take remedial action, and incorporating Micron's Trade Secrets into its own operations and products.

56. As a direct and foreseeable result of YMTC's intentional conduct, Micron suffered substantial harm in Idaho, including, but not limited to, the loss of trade secrets, economic injury, and business disruption. The brunt of the injury was felt at Micron's principal place of business in Idaho.

57. YMTC's actions constitute intentional conduct expressly aimed at Idaho, causing harm that YMTC knew that Micron would suffer in Idaho.

58. In sum, this Court has personal jurisdiction over YMTC at least because YMTC (i) purposefully directed conduct toward Idaho by recruiting and hiring Micron employees who worked in Idaho or accessed Micron's confidential information and Trade Secrets stored on servers located in Boise, Idaho; (ii) purposefully availed itself of the rights and benefits of the laws of the United States and the State of Idaho; (iii) knowingly accepted the benefits of Micron's Trade Secrets and confidential information obtained from former Micron employees—who worked in or collaborated with Micron employees located in Idaho—or accessed such information from Micron's servers located in Boise, Idaho; (iv) used or incorporated Micron's Trade Secrets and confidential information acquired in Idaho from former Micron employees

who worked in Idaho or accessed such information from Micron's servers located in Boise, Idaho, in YMTC's research and development, operations, and other business activities; and (v) caused harm to Micron in Idaho. Micron's claims arise out of and relate to YMTC's Idaho-directed acts, and exercising personal jurisdiction over YMTC in this District comports with due process.

59. In the alternative, this Court has personal jurisdiction over YMTC under Federal Rule of Civil Procedure 4(k)(2) for Micron's claims arising under federal law, and under pendent personal jurisdiction for Micron's related state-law claims, because, to the extent YMTC is not subject to jurisdiction in any state's courts of general jurisdiction, service of a summons or filing of a waiver of service establishes personal jurisdiction over YMTC, and exercising jurisdiction is consistent with the United States Constitution and laws.

#### 4. <u>Defendant Zhu's Misappropriation in Idaho</u>

60. Defendant Zhu committed tortious acts in Idaho by misappropriating Micron's Trade Secrets and confidential information. He acquired these Trade Secrets in Idaho under circumstances giving rise to a duty to maintain confidentiality and restrict use and disclosure of the Trade Secrets. He did so by leveraging access to Micron's enterprise network and IT systems located in Idaho. Defendant Zhu improperly retained and used these Trade Secrets and confidential information for YMTC's benefit and/or improperly disclosed them to YMTC. Defendant Zhu also committed wrongful conduct abroad in furtherance of the offenses committed in the United States including, but not limited to, misappropriation of trade secrets and breach of contract.

61. In sum, this Court has personal jurisdiction over Defendant Zhu at least because Defendant Zhu (i) resided and worked in Idaho for many years while employed by Micron; (ii) accessed Micron's Trade Secrets and confidential information in Idaho, including information

stored on Micron's servers located in Boise, Idaho; (iii) owed confidentiality and assignment obligations to Micron arising from his employment in Idaho; (iv) improperly retained, used, or disclosed Micron's Trade Secrets and confidential information acquired in Idaho or accessed such information from Micron's servers located in Boise, Idaho, for YMTC's benefit; and (v) caused harm to Micron in Idaho. Micron's claims arise out of and relate to Defendant Zhu's Idaho-directed acts, and exercising personal jurisdiction over Defendant Zhu in this District comports with due process.

62. In the alternative, this Court has personal jurisdiction over Defendant Zhu under Federal Rule of Civil Procedure 4(k)(2) for Micron's claims arising under federal law, and under pendent personal jurisdiction for Micron's related state-law claims, because, to the extent Defendant Zhu is not subject to jurisdiction in any state's courts of general jurisdiction, service of a summons or filing of a waiver of service establishes personal jurisdiction over Defendant Zhu, and exercising jurisdiction is consistent with the United States Constitution and laws.

### C. Venue

63. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, 28 U.S.C. § 1391(b)(3).

## IV. GENERAL ALLEGATIONS

### A. 3D NAND Technology

64. This action concerns trade secrets and confidential information used in the fabrication of three-dimensional (3D) NAND flash memory devices, which are advanced data storage chips found in electronic devices like USB drives, solid-state drives (SSDs), smartphones, and digital cameras, as well as DRAM (Dynamic Random Access Memory) devices, which are used in, e.g., mobile devices.

65. To store even more data and make chips smaller compared to earlier chip designs, the industry developed 3D NAND technology. In 3D NAND, manufacturers stack many thin, alternating horizontal layers of conducting and insulating materials—such as silicon oxide and silicon nitride (the silicon nitride layers are later replaced with a conductive material, such as tungsten, as part of the gate replacement process)—on top of a silicon wafer. They then etch tiny vertical holes through the entire stack and fill them with materials to form the memory cells and their channels, creating vertical structures. These vertical structures comprise vertical memory strings that run through multiple layers, resulting in a three-dimensional design.

66. 3D NAND structures allow for much greater storage capacity, but they bring new manufacturing challenges compared to earlier chip designs.

67. To create 3D NAND structures, manufacturers use a process called photolithography to create precise patterns on the wafer. These patterns determine exactly where material will be added or removed in later steps.

68. One of the most important steps is forming the vertical channels that define 3D NAND's unique structure. To do this, manufacturers apply a "hard mask"—a specially prepared surface layer that protects certain areas while others are exposed to etchants. Then, using chemicals or a plasma, they etch tiny, deep holes (called "high-aspect-ratio holes") through the stacked layers. Achieving the necessary precision and avoiding defects requires not only the right materials, but also careful control over the timing, sequence, and process conditions—such as temperature, pressure, and chemical composition—at each stage of the process.

69. Additional proprietary techniques are used throughout manufacturing to prevent defects and ensure the finished chip is reliable. For example, manufacturers may use specially designed "interdeck plugs" between layers, deposit etch-resistant liners, apply unique cleaning

steps at certain points, or adjust process conditions to control the shape of etched features and avoid problems like bowing, fractures, excessive etching, or unwanted diffusion. The specific choices of materials, the order and timing of cleaning steps, the methods for removing sacrificial layers, and the precise conditions for etching and cleaning are all examples of the confidential know-how and innovations that form aspects of Micron's Trade Secrets at issue in this case.

70. To access, e.g., read, the memory cells in 3D NAND, additional proprietary techniques are used to adjust the access parameters to accurately and quickly perform the access operations. The specific techniques for performing these adjustments are further examples of confidential know-how and innovations that form aspects of Micron's Trade Secrets at issue in this case.

71. This action also concerns Micron's development of a low-power circuit for the input-output path of DRAM. One important aspect of certain DRAM products is how much power the DRAM consumes, e.g., while reading data from, and writing data to, the memory device, particularly for mobile computing applications.

### B. Micron Develops NAND Technology and Products

72. For over two decades, Micron has been at the forefront of developing new and innovative flash memory products. It introduced its first NAND product in 2005.[10]

73. In March 2015, Micron launched its first 3D NAND product, a 32-layer high-density memory chip. Micron had filed dozens of patents on 3D NAND technology long before the product launch. Indeed, Micron described innovative 3D NAND arrays in patents it filed well before 2015.

---

[10] *FMS Timeline*, TERRAPINN HOLDINGS LTD. MMXIV (last accessed July 9, 2026), https://www.terrapinn.com/conference/future-memory-storage/FMS-Timeline.stm [https://perma.cc/Z4XX-ZNQM].

74. Since its initial 3D NAND product launch in 2015, Micron has continued to lead the world in 3D NAND innovation by developing chips with greater memory capacity and capabilities. In early 2018, Micron doubled the number of layers in its 3D NAND products, releasing its 64-layer 3D NAND.

75. In 2019, Micron built early versions of its 128-layer 3D NAND chips and shared them with select customers for testing and feedback. Then, in 2020, Micron became the first company to make 176-layer 3D NAND chips widely available on the market. In July 2022, Micron became the first company to scale its 3D NAND technology to 232-layers in production. Micron's ongoing innovation and leadership in 3D memory have been recognized by the industry.

**C. Micron Invested Significantly in Its Trade Secrets to Develop 3D NAND Products**

76. In developing and commercializing its 3D NAND products, Micron developed numerous trade secrets. Micron's Trade Secrets are the result of more than a decade of intensive research, development, and commercial experience in the field of 3D NAND memory technology, at a cost of tens of millions of dollars. These Trade Secrets were developed through the work of highly specialized engineering teams in one or more of, and are [redacted]

77. The technical know-how, process innovations, and design solutions reflected in these Trade Secrets represent a substantial commercial advantage over competitors in efficiently fabricating high-density and power-efficient 3D NAND and DRAM devices, and are not generally known by others in the industry or by persons skilled in the trade, nor are they readily ascertainable by these individuals.

**D. Micron Diligently Protects Its Trade Secrets**

78. Micron's Trade Secrets are subject to robust and reasonable measures to ensure their secrecy and to prevent unauthorized disclosure or use. Micron maintains physical security at its facilities, including badge-controlled access, security personnel, and surveillance systems. Access to sensitive areas and information is limited to employees and contractors with a demonstrable "need to know" business reason.

79. Micron employs comprehensive electronic security measures, such as firewalls, password-protected systems, and encrypted communications, to safeguard its confidential information and trade secrets. Access to digital files containing trade secrets is restricted to authorized personnel, and all access is logged and monitored.

80. All Micron employees, including employees of Micron's subsidiaries and affiliates with access to Micron's Trade Secrets and confidential information, including former employees Defendant Zhu, Song, Zhenyu Lu, Liu, Hu, Tao, Zhou, Lee, and Tan, are required to sign employment agreements imposing confidentiality and assignment obligations as a condition of employment. These agreements include explicit confidentiality provisions prohibiting the unauthorized use or disclosure of Micron's Trade Secrets and confidential information, both during and after employment. In addition, such employees are required to sign assignment agreements, which provide that any discoveries or work product developed during their employment are assigned to and the property of Micron.

81. Specifically, Defendant Zhu agreed on January 9, 2006, that he would not disclose or use, directly or indirectly, during or after his employment with Micron, any "Micron Confidential Information" except in connection with his job duties with Micron and in compliance with Micron's policies regarding confidentiality and nondisclosure agreements. Confidential Information was broadly defined to include information that relates to "inventions,

technology, products, product specifications, processes, performance and yield data," among other categories of information. Defendant Zhu's agreement with Micron also required him, upon the termination of his employment, to leave with Micron all documents containing Confidential Information. Ex. A. Zhu's agreement with Micron also required him, upon the termination of his employment, to leave with Micron all documents containing Confidential Information. In addition, on January 9, 2006, Defendant Zhu executed an Assignment of Inventions and Rights Agreement. Ex. B. In this Assignment Agreement, Defendant Zhu assigned and agreed to assign to Micron all of his "right, title and interest in and to all inventions, discoveries, ideas, process, works of authorships, mask works, drawings, logos, development, concepts, and improvements" during his employment with Micron. Ex. B.

82. Likewise, Song agreed on December 8, 2008, that he would not disclose or use, directly or indirectly, during or after his employment with Micron, any "Confidential Information" except in connection with his job duties with Micron and in compliance with Micron's policies regarding confidentiality and nondisclosure agreements. Confidential Information was broadly defined to include information that relates to "inventions, technology, products, product specifications, processes, performance and yield data," among other categories of information. Song's agreement with Micron also required him, upon the termination of his employment, to leave with Micron all documents containing Confidential Information. Attached as Exhibit C is a true and correct copy of Song's Confidential Information and Nonsolicitation Agreement ("Song Confidentiality Agreement"). In addition, on December 8, 2008, Song executed an Assignment of Inventions and Rights Agreement ("Song Assignment Agreement"). In this Assignment Agreement, Song assigned and agreed to assign to Micron all of his "right, title and interest in and to all inventions, discoveries, ideas, process, works of authorships, mask

works, drawings, logos, development, concepts, and improvements" during his employment to Micron. Attached as Exhibit D is a true and correct copy of Song's Assignment Agreement ("Song Assignment Agreement").

83. Moreover, Micron regularly conducts training and provides written policies to its employees regarding the protection of confidential information and trade secrets. Employees are reminded of their obligations to safeguard such information and are required to certify their understanding and compliance.

84. Micron protects each of the Trade Secrets by the diligent measures described above. Further, each of the Trade Secrets derives independent economic value from not being generally known or readily ascertainable by others in the industry. If another semiconductor manufacturer were to obtain such Trade Secrets, it could accelerate its own research and development by months or years and save millions of dollars in development costs. A semiconductor manufacturer with access to the Trade Secrets could go to market more quickly as it would essentially have a technological "shortcut" from the Trade Secrets and could greatly accelerate its development and obtain an improper advantage in the industry. And a semiconductor manufacturer with access to the Trade Secrets could improve its yield and fabricate chips more efficiently and quickly, increasing its profit margin.

**E. YMTC's Recruitment of Additional Former Micron Engineers with Access to Micron's Trade Secrets**

85. As described above, in addition to Defendant Zhu, several of Micron's engineers, while entrusted with Micron's confidential information and Trade Secrets, were recruited by YMTC to obtain and use those Trade Secrets and confidential information. Many of these engineers were listed as inventors on YMTC patents filed less than two years after their departure from Micron. As noted previously, Micron has learned that YMTC is not the rightful

owner of certain of these patents because, by virtue of assignment agreements, Micron owns all rights, title, and interest in the claimed inventions. Further, as set forth below, some of those patents relate to the subject matter of Micron's Trade Secrets and confidential information, which Micron did not discover until it began its investigation in defense of YMTC's patent lawsuits, the first of which was initiated in November 2023, as further described below. Further, YMTC and Zhu concealed their misconduct from Micron. Some of these engineers stated they were departing from Micron due to personal or family reasons (as Zhu did), and concealed that they intended to join YMTC; likewise, YMTC concealed its intentional recruitment of these Micron engineers. It was not until Micron began investigating its defenses in response to YMTC's initiation of litigation that Micron discovered the conduct which demonstrates YMTC's and Defendant Zhu's misappropriation of Micron's Trade Secrets.

**1. Daesik Song**

86. In consideration of providing employment to Song, he "assign[ed] and agree[d] to assign to [Micron], or its designee, all of [his] right, title and interest in and to all inventions, discoveries, ideas, processes, works of authorship, mask works, drawings, logos, developments, concepts, and improvements…whether or not patentable, copyrightable, or subject to other forms of protection, made, created, developed, written, reduced to practice, or conceived by [him], in whole or in part, either solely or jointly with others, during the period of time [he is] in the employ of or providing service to Micron, whether during or outside of regular working hours." Ex. D.

87. During his employment in San Jose, California at Micron, Song had access to information about the development of Micron's input-output circuitry for its memory products. Song was involved with, worked on, and jointly collaborated with other engineers at Micron on the development of this input-output circuitry. In 2016, Song authored a document entitled

"Serializer_improvement.pptx," which depicts input-output circuitry. Specifically, Song had access to proprietary information regarding Micron's input-output circuitry, including access to Trade Secret Class No. 8, worked with colleagues in Boise, and on information and belief, accessed confidential information that was stored on Micron's servers in Boise. *See infra* §IV.H.8.

88. On June 10, 2019, YMTC filed Patent Application No. 16/436,887, which claims priority to PCT/CN2019/085451, filed on May 5, 2019, and which issued as U.S. Patent No. 10,707,851 (the "'851 Patent").[11] The '851 Patent names Song as an inventor and claims technologies that Song learned of and worked on while at Micron. Indeed, the subject matter of YMTC's '851 Patent relates to the circuitry shown in "Serializer_improvement.pptx," the confidential document that Song authored while working at Micron under confidentiality and assignment obligations. This circuitry that Song was working on at Micron, at least under YMTC's construction of its patent, [redacted]

[11] A copy of the '851 Patent is attached hereto as Ex. H.

[redacted]

89. The ’851 Patent relates to the subject matter of Micron’s Trade Secret Class No. 8 and confidential information that Song accessed and developed during his employment at Micron and which he was obligated to assign to Micron under his Assignment Agreement. The subject matter of the ’851 Patent, combined with Song’s work at and knowledge of Micron’s DRAM technology, and the results of Micron’s investigation following YMTC’s November 2023 infringement complaint—in which Micron discovered, among other things, that the ’851 patent, which YMTC asserted in its the October 2025 infringement complaint against Micron, lists Song as a named inventor—collectively indicate that YMTC has received and used Micron’s Trade Secret Class No. 8 and confidential information. On information and belief, Song acquired and retained Micron’s Trade Secrets and confidential information through improper means by wrongfully retaining the Trade Secrets and confidential information, and subsequently used or provided it for YMTC’s benefit, in violation of his contractual obligations. On information and belief, upon joining YMTC, Song disclosed to YMTC Micron’s Trade Secrets and confidential information for the benefit of YMTC and within the scope of his employment at YMTC. YMTC

knowingly placed Song in a position where he could utilize Micron's Trade Secrets and confidential information to advance YMTC's research and development. On information and belief, YMTC encouraged Song to use Micron's confidential information and provide it to YMTC. Specifically, YMTC directed Song to file, among other filings, a U.S. patent application that relates to the subject matter of Micron's Trade Secret Class No. 8 and confidential information.

90. Alternatively, YMTC became aware, or should have become aware, that Song was using or providing to YMTC Micron's confidential information, including in preparing a YMTC patent application. YMTC ratified this conduct by accepting the benefits of the misappropriated information, failing to take remedial action, and incorporating Micron's confidential information into its own operations.

**2. <u>Hua Tan</u>**

91. Hua Tan was employed by Micron China in Shanghai, China from September 28, 2015, to March 2021 as a NAND Product, Verification, and Design Engineer before joining YMTC as a Storage System Architect in March 2021.

92. Tan represents that he has been employed at YMTC since March 2021 through the present, including as Storage System Architect and Department Manager of Architecture Engineering.

93. In consideration of Tan's employment and compensation, Tan entered into the Confidentiality and Intellectual Property Agreement (China), which required him to protect confidential information of the Micron Group, which included the parent company Micron, Micron China, and each of their respective subsidiaries and affiliated companies. Tan agreed in the Confidentiality and Intellectual Property Agreement (China) to "keep confidential and … not use or disclose any Proprietary Information or anything relating to it" without authorization both

during and after his employment, except as necessary in the ordinary course of performing his duties. The agreement defined "Proprietary Information" to include information "that was, is or will be developed, created, or discovered by or on behalf of a Group member; or that became, becomes or will become known by; or was, is, or will be conveyed to a Group Member, which has commercial value in a Group Member's business." Further, "Proprietary Information" was broadly defined to include, among other things, "Inventions," "products," "actual research and development," "Intellectual Property Rights," "manufacturing, design and engineering processes" of the Micron Group. The agreement also prohibited Tan from removing any "Group Documents and Materials"—defined to include documents and materials that embody or reflect Proprietary Information—from the business premises of any Group Member or deliver any such information to any party outside of the Group. Tan was also obligated to return all "Group Documents and Materials" upon termination of his employment. In addition, Tan's Offer Letter required his compliance with the "general instructions, rules, and regulations" of parent company Micron including any "staff handbook" that Micron may issue. Micron would regularly issue a Global Team Member Handbook ("Global Handbook") to its employees and those of its subsidiaries and affiliates. The Global Handbooks would discuss protecting Micron's intellectual property and that misuse of Micron's confidential information was unacceptable conduct. The Global Handbooks further provided that "[t]eam members are responsible for keeping informed of changes to this Global Handbook," and directed employees to access the current version online.

94. During his employment at Micron China and as part of his job duties, Tan had access to Micron's proprietary information about methods and configurations for adjusting the read voltage in a 3D NAND chip. Specifically, Tan had access to proprietary information

regarding Micron's [redacted] 3D NAND technology node, including access to Trade Secret Class No. 7, worked with colleagues in Boise, and on information and belief, accessed confidential information that was stored on Micron's servers in Boise. *See infra* §IV.H.7.

95. Tan was involved with, worked on, and jointly collaborated with other engineers at Micron on the development of firmware implementing Micron's read-offset adjustment technology.

96. On February 23, 2023, YMTC filed U.S. Patent Application No. 18/113,616, a continuation of International Application No. PCT/CN2023/070613, filed January 5, 2023, entitled "Read Offset Compensation in Read Operation of Memory Device." That application later issued as U.S. Patent No. 12,424,285 (the "'285 Patent").[12] The '285 Patent names Tan as an inventor and claims technologies that Tan learned of while at Micron. Indeed, the subject matter of YMTC's '285 Patent relates to methods and configurations for adjusting the read voltage in a 3D NAND chip, including reading memory cells to determine a read-offset voltage, determining an offset according to the percentage of bits successfully read, and employing a specific mapping of different offsets to various percentages of successful bit readouts.

97. The '285 Patent relates to the subject matter of Micron's Trade Secret Class No. 7 and confidential information that Tan accessed and developed during his employment at Micron and which he was obligated to assign to Micron under his Confidentiality and Intellectual Property Agreement (China). The subject matter of the '285 Patent, combined with Tan's access to and knowledge of Micron's read-offset adjustment technology, and the results of Micron's investigation following YMTC's November 2023 infringement complaint—in which Micron discovered that Tan is listed as an inventor on the '285 Patent—collectively indicate that YMTC

[12] A copy of the '285 Patent is attached hereto as Ex. I.

has received and used Micron's Trade Secret Class No. 7 and confidential information. On information and belief, Tan acquired and retained Micron's Trade Secrets and confidential information through improper means by wrongfully retaining the Trade Secrets and confidential information, and subsequently used or provided it for YMTC's benefit, in violation of his contractual obligations.

98. On information and belief, upon joining YMTC, Tan disclosed to YMTC Micron's Trade Secrets and confidential information for the benefit of YMTC and within the scope of his employment at YMTC. YMTC knowingly placed Tan in a position where he could utilize Micron's Trade Secrets and confidential information to advance YMTC's research and development. On information and belief, YMTC encouraged Tan to use Micron's confidential information and provide it to YMTC. Specifically, YMTC directed Tan to file, among other filings, a U.S. patent application that relates to the subject matter of Micron's Trade Secret Class No. 7 and confidential information.

99. Alternatively, YMTC became aware, or should have become aware, that Tan was using or providing to YMTC Micron's confidential information, including in preparing a YMTC patent application. YMTC ratified this conduct by accepting the benefits of the misappropriated information, failing to take remedial action, and incorporating Micron's confidential information into its own operations.

**3. <u>Jun Liu</u>**

100. Jun Liu was employed by Micron from September 3, 2002, to June 9, 2017, including as a Principal Process Integration Engineer and Senior Member of Technical Staff at Micron's Boise campus before leaving to join YMTC.

101. Liu is a named inventor on U.S. Patent No. 10,559,592 filed by YMTC, which claims priority to PCT/CN2018/099352 filed on August 8, 2018.[13] As discussed below, U.S. Patent No. 10,559,592 relates to the subject matter of Micron's Trade Secret Class No. 4. Liu is also a named inventor on U.S. Patent No. 10,643,709 (the "'709 Patent") filed by YMTC, which claims priority to PCT/CN2018/100445 filed on August 14, 2018.[14] As discussed below, the '709 Patent relates to the subject matter of Micron's Trade Secrets from Micron's Trade Secret Class No. 3. Micron's Trade Secret Class No. 3 relates to improved connection between high aspect-ratio features in a 3D NAND memory array having a large number of layers.

102. Liu resigned from Micron with his last day on June 9, 2017, stating in his resignation form that he was leaving "for family reasons" in order to "take care of family members and be closer to them." On information and belief, Liu has been a YMTC employee or contractor since departing from Micron. Liu's LinkedIn profile continues to show uninterrupted employment at Micron in Boise, Idaho, from 2002 through the present, with no reference to any subsequent position at YMTC.

103. Liu filed his first patent application naming YMTC as the assignee on March 30, 2018. In the approximately 15 years that Micron employed Liu, he filed about 500 unique patent applications. Since joining YMTC, Liu has filed about 351 unique patent applications, and about 290 of those applications were filed in the first approximately two years of Liu's employment with YMTC.

[13] A copy of U.S. Patent No. 10,559,592 is attached hereto as Ex. J.
[14] A copy of the '709 Patent is attached hereto as Ex. K.

**4. <u>Yushi Hu</u>**

104. Yushi Hu was employed by Micron from June 27, 2011, to August 12, 2016, including as a Senior Engineer-NAND PI at Micron's Boise campus before leaving to join YMTC.

105. Hu is a named inventor on U.S. Patent No. 11,737,263 (the "'263 Patent") filed by YMTC, which claims priority to PCT/CN2018/105442 filed on September 13, 2018.[15] As discussed below, the '263 Patent relates to the subject matter of Micron's Trade Secrets from Micron's Trade Secret Class No. 6, which relates to improving connections for high aspect-ratio features of 3D NAND memory chips with a large number of layers.

106. Hu filed his first patent application naming YMTC as the assignee on August 21, 2017. In Hu's five-year employment at Micron, he was named as an inventor on about 40 unique patent applications. Since starting at YMTC, Hu is identified as an inventor on about 199 unique patent applications, and about 178 of those applications were filed in the first approximately two years of Hu's employment with YMTC.

**5. <u>Qian Tao</u>**

107. Qian Tao resigned from Micron effective May 2, 2017, stating in his resignation form that he needed "to take care of [an] elderly parent (I'm the only son) and need to relocate back to China." Unlike other former employees, Tao's LinkedIn profile reflects that he joined YMTC as Assistant Director in June 2017, a substantial jump from his position as senior engineer at Micron and just one month after leaving Micron.

108. Tao filed his first patent application naming YMTC as the assignee on August 21, 2017. In Tao's six-year employment at Micron, he filed about 74 unique patent applications.

---

[15] A copy of the '263 Patent is attached hereto as Ex. L.

Since starting at YMTC, Tao is named on 182 filed patent applications, and about 172 of those applications were filed in the first approximately two years of Tao's employment with YMTC.

**6. Wenxi Zhou**

109. Wenxi Zhou worked at Micron from January 28, 2011, to December 31, 2018, including as a PI Section Manager, in Singapore. Zhou joined YMTC as an R&D Manager / Assistant Director in January 2019.

110. Zhou is a named inventor on U.S. Patent No. 11,862,565 (the "'565 Patent") filed by YMTC on May 15, 2020.[16] As discussed below, the '565 Patent relates to the subject matter of Micron's Trade Secrets from Micron's Trade Secret Class No. 1—which relates to improving connections for high aspect-ratio features of 3D NAND memory chips with a large number of layers.

111. Zhou filed his first patent application naming YMTC as the assignee on August 21, 2017. Zhou is not a named inventor on any Micron patents. Zhou is now named as an inventor on over 1,000 YMTC patents, and about 522 of those applications were filed in the first approximately two years of Zhou's employment with YMTC.

**F. YMTC Is Founded in China and Rapidly Manufactures and Releases 3D NAND Products**

112. YMTC is a Chinese semiconductor company that was founded on July 26, 2016. YMTC's establishment followed the Chinese government's announcement of the "Made in China 2025" initiative, which identified semiconductors as a critical growth industry and provided significant state-backed investment through the National Integrated Circuit Industry Investment Fund, also known as the "Big Fund."

[16] A copy of the '565 Patent is attached hereto as Ex. M.

113. YMTC is a newcomer to 3D NAND manufacturing. YMTC has built and marketed four generations of NAND storage technology: a 32-layer 3D NAND memory, a 64-layer 3D NAND memory, a 128-layer 3D NAND memory, and a 232-layer 3D NAND memory.

114. In 2019, some companies had been producing 64-layer 3D NAND chips since 2017, and Micron had been doing so since early 2018. YMTC was lagging behind the industry.[17] Only in September 2019, YMTC began volume production of its 64-layer 3D NAND chips.[18]

115. YMTC needed to play catch-up.[19] In the semiconductor industry, innovation for each new version of a chip requires significant research and development that is built upon the foundation of prior generations of technology. It takes years and thousands of hours of engineering time to have new generations of chips ready to be manufactured and sold at scale. Yet, by April of 2020, less than a year after it began mass production of its 64-layer 3D NAND chips, YMTC announced that it had already developed a 128-layer 3D NAND chip.[20] YMTC skipped the development of a 96-layer chip altogether, unlike others in the industry that produced this generation.[21] By July 2021, only two years after it began mass production of its 64-layer

[17] *Id.*

[18] Arne Verheyde, *Report: China-Based Yangtze Memory Starts 64-Layer NAND Production*, TOM'S HARDWARE (Sept. 4, 2019), https://www.tomshardware.com/news/yangtze-memory-china-64-layer-nand-production,40318.html [https://perma.cc/D6PM-UASY].

[19] Josh Horwitz, *China's Memory Upstart YMTC Edges Closer to Rivals with 232-Layer Chip*, REUTERS (Aug. 4, 2022, 2:24 am CDT), https://www.reuters.com/technology/chinas-memory-upstart-ymtc-edges-closer-rivals-with-232-layer-chip-2022-08-04/.

[20] Eliza Gkritsi, *A Chinese Firm Made a Memory Chip that Can Compete with Samsung. What's Next?*, TECHNODE (Apr. 23, 2020), https://technode.com/2020/04/23/ymtc-memory-chip/ [https://perma.cc/RYX7-CHWS].

[21] *YMTC Launches 128-Layer 3D NAND Flash Memory Chip*, TECHPOWERUP (Apr. 13, 2020, 2:49 am), https://www.techpowerup.com/265699/ymtc-launches-128-layer-3d-nand-flash-memory-chip [https://web.archive.org/web/20200601071528/https://www.techpowerup.com/265699/ymtc-launches-128-layer-3d-nand-flash-memory-chip].

chip, YMTC had begun mass production of its 128-layer chip. Then, only a year later, YMTC announced its 200+-layer 3D NAND chip.[22]

116. YMTC had been a marginal player in the global 3D NAND market, holding less than 1% market share in 2020. By 2023, YMTC expanded its share to just over 5%.

117. On information and belief, YMTC sells substantially all of its 3D NAND products in China.

## G. YMTC Sues Micron and Its Affiliates

118. On November 9, 2023, YMTC began its litigation campaign against Micron by filing a complaint in the United States District Court for the Northern District of California against Micron and Micron Consumer Products Group, LLC ("Micron Consumer"), alleging infringement of eight patents, U.S. Patent Nos. 10,950,623, 11,501,822, 10,658,378, 10,937,806, 10,861,872, 11,468,957, 11,600,342, and 10,868,031. *See Yangtze Memory Techs. Co. v. Micron Tech., Inc.*, No. 3:23-cv-05792 (N.D. Cal.) ("*YMTC I*").

119. According to the YMTC I complaint, YMTC, then a seven-year-old company, held itself out as one of the world's most innovative developers and manufacturers of 3D NAND flash memory chips. YMTC alleged that Micron, an established global leader with decades of experience, a portfolio of tens of thousands of patents, and billions invested in research and development, was so threatened by YMTC's rise that it resorted to using YMTC's purported patented inventions—patents with priority dates no earlier than 2018—rather than engaging in fair business practices.

---

[22] *YMTC 232L TLC 3D NAND (YMTC 4th Gen, Xtacking 3.0, Parent Product: HikSemi CC700 2 TB SSD), Disruptive Event Briefing*, TECHINSIGHTS (Nov. 2022), https://www.techinsights.com/sites/default/files/2022-11/TechInsights-DE-YMTC-232L-FINAL.pdf [https://perma.cc/THS5-YMVW].

120. On July 12, 2024, YMTC filed another complaint in the United States District Court for the Northern District of California against Micron and Micron Consumer, alleging infringement of 11 patents that are different from those asserted in *YMTC I*, U.S. Patent Nos. 10,879,254, 11,581,322, 10,886,291, 11,482,532, 11,145,666, 11,450,604, 10,672,711, 11,101,276, 11,568,941, 10,879,164, and 12,010,838. *See Yangtze Memory Techs. Co. v. Micron Tech., Inc.*, No. 3:24-cv-04223 (N.D. Cal.) ("*YMTC II*").

121. On October 6, 2025, YMTC filed yet another patent infringement case, this time in the Eastern District of Texas, against Micron, Micron Semiconductor Products, Inc. ("Micron Semiconductor" or "MSPI"), Micron Technology Texas, LLC ("Micron Texas"), and Avnet, Inc. ("Avnet"), alleging infringement of United States Patent Nos. 10,707,851, 11,233,066, 12,068,250, 12,075,621, 12,094,767, 12,254,925, 12,266,403, and 12,232,313. *See Yangtze Memory Techs. Co. v. Micron Tech., Inc.*, No. 2:25-cv-01010 (E.D. Tex.) ("*YMTC III*").

122. As part of its defense of these litigations, Micron began to investigate YMTC's patent portfolio, including YMTC patents that purport to identify a YMTC inventor but which relate to the subject matter of Micron's Trade Secrets and confidential information. It was only through Micron's defense of these litigations that Micron discovered Defendants' misappropriation of Micron's Trade Secrets.

**H. YMTC's Acquisition of Micron's Trade Secrets**

123. As a newcomer to the 3D NAND market, YMTC lacked the years of foundational experience and technological development that enabled Micron to develop its Trade Secrets and other know-how that led to production releases of its 3D NAND products, including the 100, 110, 120, and 130 (and beyond) series. On information and belief, YMTC developed the technology at issue in this case with access to Micron's Trade Secrets and the head start provided by Micron's decade-long investment in 3D NAND innovation.

124. Micron has been developing flash technology since before 2005, and Micron has been working on the 3D NAND technology since before 2010. In contrast, YMTC was founded in July 2016, a little over two years before the filing of its first patent application that relates to the subject matter of Micron's Trade Secrets and confidential information described below.

125. Given the complexity of the technology and the extensive research and development required, along with the information set forth below including the former Micron engineers' misconduct, the only reasonable inference is that YMTC improperly acquired and used Micron's Trade Secrets, including as a guide or reference to further its own development.

126. YMTC's acquisition and use of these Trade Secrets was not accidental or coincidental. Rather, YMTC intentionally targeted and recruited Micron employees, including Defendant Zhu, knowing they had access to and possessed confidential and proprietary information belonging to Micron, including the Trade Secrets described below. On information and belief, YMTC encouraged Defendant Zhu and other former Micron employees to use these trade secrets for the benefit of YMTC. While at Micron, Defendant Zhu was a trusted employee and had access to most of the Trade Secrets described below. Defendant Zhu improperly retained, used, and disclosed to YMTC Micron's Trade Secrets for YMTC's improper gain and to enhance its position in the market.

127. Alternatively, on information and belief, YMTC knew, or should have known, that Defendant Zhu and the other employees it hired from Micron were using or disclosing to YMTC Micron's Trade Secrets, and ratified this conduct by accepting the benefits of the misappropriated information, failing to take remedial action, and incorporating Micron's Trade Secrets into its own operations and products.

**1. Trade Secret Class No. 1: [redacted] hard mask for etching high aspect-ratio features, along with specific process conditions**

128. Micron's Trade Secrets include processes for mass producing 3D NAND memory arrays, including masking structures, for making the tiny, deep holes that run vertically through the layers of a 3D NAND chip (Trade Secret Class No. 1). Making these holes—called "high-aspect-ratio holes"—is a very complex process. It requires using a "hard mask," which is a protective coating that covers parts of the chip so only certain areas are exposed; the hard mask's material and the mix of chemicals added to it ("doping") are closely guarded secrets. Next, the chip is "etched," meaning chemicals or a plasma are used to carve out the holes where the hard mask does not protect the chip. Trade Secret Class No. 1 relates to [redacted] hard mask with specific doping concentrations, the specific chemistries and dimensions for forming the hard mask, and the process for removing the highly boron-doped mask.

129. Micron [redacted] This information is kept confidential at Micron and is not publicly disclosed. A semiconductor manufacturer like YMTC with access to Trade Secret Class No. 1 could accelerate its own chip development, improve the quality of the chips, and improve yield and manufacturing efficiency of the chips.

130. YMTC's patent filings, specifically U.S. Patent No. 11,862,565, which has a priority date of March 13, 2020, and its Chinese patent CN113192958B, which has a priority date of April 28, 2021, reflect technical solutions that relate to the subject matter of Trade Secret Class No. 1 and confidential information.

131. The technical descriptions in these patent filings [redacted] The subject matter of these patent filings, combined with the results of Micron's investigation following YMTC's November

2023 infringement complaint—which revealed that certain former Micron engineers with access to Micron's [redacted] hard mask technology were named as inventors on YMTC's asserted patents—collectively indicate defendants' misappropriation of Trade Secret Class No. 1 and confidential information.

132. On information and belief, YMTC improperly obtained Trade Secret Class No. 1 from former Micron engineers. Specifically, while at Micron and subject to confidentiality obligations, Defendant Zhu and/or Zhou had access to this confidential information. In addition, the '565 Patent lists former Micron engineer Zhou as an inventor. Zhou was employed at Micron from January 28, 2011, to December 31, 2018. On information and belief, YMTC acquired knowledge of Trade Secret Class No. 1 through Defendant Zhu and/or Zhou.

133. Alternatively, on information and belief, YMTC improperly acquired knowledge of Trade Secret Class No. 1 directly from at least one or more other former Micron engineers who had access to the [redacted] process information, including Tao.

### 2. <u>**Trade Secret Class No. 2: [redacted] along with specific tool configuration and adjustments, in the wet-nitride exhumation step**</u>

134. Micron's Trade Secrets include methods for removing temporary layers in a replacement gate architecture—called "sacrificial silicon nitride layers"—from the stack of alternating materials in a 3D NAND chip, including exhuming the silicon nitride layers from the 3D memory stack (Trade Secret Class No. 2). Trade Secret Class No. 2 relates to: (1) the chemicals to use and the specific conditions (e.g., pressure, temperature) needed to effectively remove the silicon nitride, [redacted] (2) the configuration of the tool, [redacted] (3) how to use this combination of chemicals and conditions in a way that avoids certain problems or defects in the chip. Both the choice of processing parameters and the chemicals

used in the process are closely guarded secrets at Micron because they are essential for forming a stack that is not riddled with processing defects that would render the chip inoperable. This proprietary process also significantly decreases processing time. A semiconductor manufacturer like YMTC could take Trade Secret Class No. 2 and accelerate its own chip development, improve the quality of its chips, and improve yield and manufacturing efficiency.

135. Micron [redacted] This information is kept confidential at Micron and is not publicly disclosed.

136. YMTC's U.S. Patent App. No. 2019/0355595A1,[23] which has a priority date of May 17, 2018, and U.S. Patent No. 11,862,565, which has a priority date of March 13, 2020, reflect technical solutions that relate to the subject matter of Trade Secret Class No. 2 and confidential information. The subject matter of these patent filings, combined with the results of Micron's investigation following YMTC's November 2023 infringement complaint—which revealed that certain former Micron engineers with access to Micron's wet-nitride exhumation technology were named as inventors on YMTC's asserted patents—collectively indicate defendants' misappropriation of Trade Secret Class No. 2 and confidential information.

137. On information and belief, YMTC improperly obtained Micron's Trade Secret Class No. 2 and confidential information from former Micron engineers. Specifically, while at Micron and subject to confidentiality obligations, Defendant Zhu had access to this information. Other former Micron employees, such as Tao, who worked at Micron from June 6, 2011, to May 2, 2017, had access to Micron's replacement gate research and development during his employment at Micron and while subject to confidentiality obligations. On information and

[23] A copy of U.S. Patent App. No. 2019/0355595A1 is attached hereto as Ex. N.

belief, YMTC acquired knowledge of Trade Secret Class No. 2 through Tao and/or Defendant Zhu.

### 3. Trade Secret Class No. 3: [redacted] CMP of deck plugs

138. Micron's Trade Secrets include methods to prevent defects from forming at the boundaries of plugs, such as inter-deck plugs, including for example, the following classes of trade secrets: (1) [redacted] and (2) etch techniques for the interdeck plug [redacted] inter-deck plug (Trade Secret Class No. 3).

139. Micron [redacted] This information is kept confidential at Micron and is not publicly disclosed. A semiconductor manufacturer like YMTC could take Trade Secret Class No. 3 and accelerate its own chip development, improve the quality of the chips, and improve yield and manufacturing efficiency of the chips.

140. The '709 Patent, which has a priority date of August 14, 2018, reflects technical solutions that relate to the subject matter of Trade Secret Class No. 3 and confidential information. The '709 Patent describes, for example, a [redacted] that are consistent with Trade Secret Class No. 3. Further, the patent describes a result ([redacted]) that is consistent with the use of Trade Secret Class No. 3. The subject matter of the '709 Patent, combined with the results of Micron's investigation following YMTC's November 2023 infringement complaint—which revealed that certain former Micron engineers with access to Micron's interdeck plug technology were named as inventors on YMTC's asserted patents—collectively indicate defendants' misappropriation of Trade Secret Class No. 3 and confidential information.

141. On information and belief, YMTC improperly obtained Trade Secret Class No. 3 from former Micron engineers. Specifically, while at Micron and subject to confidentiality obligations, Defendant Zhu had access to this information. In addition, the '709 Patent lists former Micron engineer Liu as an inventor. Liu was employed at Micron from September 3, 2002, to June 9, 2017, and had access to the [redacted] and related test information during his employment. On information and belief, YMTC acquired knowledge of Trade Secret Class No. 3 through Defendant Zhu and/or Liu, who had acquired this confidential information during their time at Micron while subject to confidentiality obligations to Micron.

142. Alternatively, on information and belief, YMTC acquired knowledge of Trade Secret Class No. 3 directly from at least one or more other former Micron engineers who had access to the [redacted] process information, including Tao, Hu, and/or Lee.

**4. <u>Trade Secret Class No. 4: Nonconsumable liners for profile control</u>**

143. Micron's Trade Secrets include methods for controlling the shape ("profile control") of the high-aspect-ratio holes created during the "pillar etch" and "staircase contact etch" in making a 3D NAND chip. These techniques relate to (1) [redacted] (Trade Secret Class No. 4). Trade Secret Class No. 4 includes the materials and conditions under which to perform the steps identified above.

144. Micron [redacted] This information is kept confidential at Micron and is not publicly

disclosed. A semiconductor manufacturer like YMTC could take Trade Secret Class No. 4 and accelerate the development of its own chips, improve the quality of the chips, and improve the yield and manufacturing efficiency of the chips.

145. YMTC's patent filings, specifically U.S. Patent No. 11,631,592, which has a priority date of February 11, 2019, reflect technical solutions that relate to the subject matter of Trade Secret Class No. 4 and confidential information.[24] Defendant Zhu worked on Micron's nonconsumable liner research and development during his involvement with Micron's [redacted] 3D NAND technology node.

146. The patent describes techniques consistent with Trade Secret Class No. 4, for example, [redacted] Further, the patent describes a result [redacted] that is consistent with the profile control techniques subject to Trade Secret Class No. 4. The subject matter of this patent, combined with the results of Micron's investigation following YMTC's November 2023 infringement complaint—which revealed that Defendant Zhu, a former Micron engineer with access to Micron's nonconsumable liner technology, was named as an inventor on certain of YMTC's asserted patents—collectively indicate defendants' misappropriation of Trade Secret Class No. 4 and confidential information.

### 5. **Trade Secret Class No. 5: [redacted] cleaning**

147. Micron's Trade Secrets include methods for cleaning certain areas after a process known as the "pillar etch punch" (Trade Secret Class No. 5). Trade Secret Class No. 5 relates to: [redacted] to clean and shape materials at [redacted]

[24] A copy of U.S. Patent No. 11,631,592 is attached hereto as Ex. O.

[redacted] (2) performing the cleaning under carefully controlled chamber conditions, including the presence of certain chemicals. [redacted]

148. Micron [redacted] This information is kept confidential at Micron and is not publicly disclosed. A semiconductor manufacturer like YMTC could take Trade Secret Class No. 5 and accelerate its own chip development, improve the quality of the chips, and improve yield and manufacturing efficiency of the chips.

149. YMTC's patent filings, specifically Chinese patent CN108649033A, which has a priority date of October 12, 2018, reflect technical solutions that relate to the subject matter of Trade Secret Class No. 5 and confidential information.

150. While at Micron and subject to confidentiality obligations, Defendant Zhu had access to this confidential information, including the 130 series test chip flow. Chinese patent CN108649033A describes processes, for example [redacted] consistent with Trade Secret Class No. 5, and further [redacted] consistent with Trade Secret Class No. 5. Further, the patent describes a result ([redacted] that is consistent with the post-pillar etch techniques subject to Trade Secret Class No. 5. The subject matter of this patent, combined with the results of Micron's investigation following YMTC's November 2023 infringement complaint—which revealed that Defendant Zhu, a former Micron engineer with access to Micron's [redacted] cleaning technology, was named as an inventor on certain of YMTC's asserted patents—collectively indicate defendants' misappropriation of Trade Secret Class No. 5 and confidential information.

151. Alternatively, on information and belief, YMTC acquired knowledge of Trade Secret Class No. 5 directly from at least one or more other former Micron engineers who had access to the [redacted] process information, including Tao.

**6. Trade Secret Class No. 6: [redacted] bottom pillar sculpting**

152. Micron's Trade Secrets include methods for shaping, or "sculpting," certain areas inside the tiny holes—called pillar holes—in a 3D NAND chip (Trade Secret Class No. 6). Trade Secret Class No. 6 relates to: (1) using specific chemical solutions [redacted] for sculpting and [redacted] By using the right chemicals and conditions, Micron can [redacted] important for making sure the chip functions correctly and reliably, [redacted]

153. Micron [redacted] This information is kept confidential at Micron and is not publicly disclosed. A semiconductor manufacturer like YMTC could take Trade Secret Class No. 6 and accelerate its own chip development, improve the quality of the chips, and improve yield and manufacturing efficiency of the chips.

154. YMTC's patent filings, specifically the '263 Patent, which has a priority date of September 13, 2018, relate to the subject matter of Trade Secret Class No. 6 and confidential information. The '263 Patent lists former Micron employee Yushi Hu as an inventor and is assigned to YMTC. In addition, YMTC's Chinese patent CN108649033A, which has a priority date of October 12, 2018, relates to the subject matter of Trade Secret Class No. 6 and confidential information.

155. On information and belief, YMTC improperly obtained Trade Secret Class No. 6 from former Micron engineers. Specifically, while at Micron and subject to confidentiality

obligations, Defendant Zhu had access to this information. YMTC's patents describe, for example, [redacted] consistent with Trade Secret Class No. 6, for sculpting pillar hole areas. The subject matter of these patents, combined with the results of Micron's investigation following YMTC's November 2023 infringement complaint—which revealed that Defendant Zhu and Hu, former Micron engineers with access to Micron's bottom pillar sculpting technology, were named as inventors on certain of YMTC's asserted patents—collectively indicate defendants' misappropriation of Trade Secret Class No. 6 and confidential information.

156. Alternatively, on information and belief, YMTC acquired knowledge of Trade Secret Class No. 6 directly from at least one or more other former Micron engineers who had access to the [redacted] process information, including Tao and/or Lee.

**7. <u>Trade Secret Class No. 7: Read-offset adjustments via successful read counts</u>**

157. Micron's Trade Secrets include methods and configurations for adjusting the read voltage in a 3D NAND chip (Trade Secret Class No. 7). Trade Secret Class No. 7 relates to: (1) reading memory cells, [redacted] to determine a read-offset voltage; (2) determining an offset [redacted] (3) employing different offsets [redacted]

158. Micron [redacted] This information is kept confidential at Micron and is not publicly disclosed. A semiconductor manufacturer like YMTC could take Trade Secret Class No. 7 and accelerate its own chip development, improve the quality of the chips, and improve yield and manufacturing efficiency of the chips.

159. YMTC's patent filings, specifically U.S. Patent No. 12,424,285 (the "'285 Patent"), which claims priority to PCT/CN2023/070613, filed January 5, 2023, relate to the subject matter of Trade Secret Class No. 7 and confidential information. The '285 Patent lists former Micron employee Hua Tan as an inventor and is assigned to YMTC.

160. On information and belief, YMTC improperly obtained Trade Secret Class No. 7 from former Micron engineers. Specifically, while at Micron China and subject to confidentiality obligations including keeping Micron's Proprietary Information confidential, former employee Tan had access to Micron's trade secret information as part of his job duties. YMTC's '285 Patent describes, for example, [redacted] consistent with Trade Secret Class No. 7. The '285 Patent, combined with the results of Micron's investigation following YMTC's November 2023 infringement complaint—which revealed that Tan, a former Micron engineer, had access to Micron's read-offset technology—collectively indicate YMTC's misappropriation of Trade Secret Class No. 7 and confidential information.

161. Alternatively, on information and belief, YMTC acquired knowledge of Trade Secret Class No. 7 directly from at least one or more other former Micron engineers who had access to Micron's [redacted] 3D NAND technology.

**8. <u>Trade Secret Class No. 8: Input-output serialization improvement</u>**

162. Micron's Trade Secrets include circuit design techniques and circuit configurations for data serialization for the input-output path of a memory product. Trade Secret Class No. 8 relates to: (1) multistage serialization architecture for NAND/DRAM interfaces; (2) design techniques in view of process, voltage, and temperature effects on output timing windows and power consumption; and (3) [redacted] between serialized data and control signals. Micron [redacted]

[redacted] This information is kept confidential at Micron and is not publicly disclosed. A semiconductor manufacturer like YMTC could take Trade Secret Class No. 8 and accelerate its own chip development, improve the quality of the chips, and improve yield and manufacturing efficiency of the chips.

163. YMTC's patent filings, specifically U.S. Patent No. 10,707,851 (the "'851 Patent"), which claims priority to PCT/CN2019/085451, filed on May 5, 2019, relate to the subject matter of Trade Secret Class No. 8 and confidential information. The '851 Patent lists former Micron employee Song as an inventor and is assigned to YMTC.

164. On information and belief, YMTC improperly obtained Trade Secret Class No. 8 from former Micron engineers. Specifically, while at Micron and subject to confidentiality obligations, Song had access to this information. YMTC's '851 Patent describes, for example, [redacted] consistent with Trade Secret Class No. 8. The '851 Patent, combined with the results of Micron's investigation following YMTC's November 2023 infringement complaint—which revealed that Song, a former Micron engineer, had access to Micron's I/O serialization technology—collectively indicate YMTC's misappropriation of Trade Secret Class No. 8 and confidential information.

## I. Defendants Will Cause Micron Irreparable Harm

165. The Trade Secrets at issue in this case are highly valuable and represent the culmination of years of research, development, and significant investment. These Trade Secrets provide Micron with a substantial advantage in the market and, as demonstrated above, a semiconductor manufacturer like YMTC could take the Trade Secrets and accelerate its own chip development, improve the quality of the chips, and improve yield and manufacturing efficiency of the chips. YMTC's patent applications relate to the subject matter of these same Trade Secrets and confidential information that Defendant Zhu and other former Micron engineers had access

to while employed at Micron. As alleged herein, the subject matter of those patent applications, combined with the results of Micron's investigation following YMTC's November 2023 infringement complaint—which revealed that certain former Micron engineers with access to Micron's technology were named as inventors on certain of YMTC's asserted patents—collectively indicate that YMTC has received and used Micron's Trade Secrets and confidential information. If YMTC continues to use these Trade Secrets, Micron will suffer immediate and irreparable harm. The value of these Trade Secrets depends on their secrecy; once used by others, their value is substantially diminished or lost. This is why Micron has invested heavily in developing, protecting, and maintaining the confidentiality of its Trade Secrets.

166. YMTC and other semiconductor manufacturers would have an unfair advantage if allowed to use Micron's Trade Secrets, as they could replicate Micron's technological advances without incurring the same investment of time, resources, and expertise. Such semiconductor manufacturers could use Micron's proprietary methods to improve their own products, accelerate their development timelines, or even market their products against Micron's, thereby undermining Micron's position in the market.

167. Further, Defendants' mere possession and use of Micron's trade secret information could cause immediate harm to Micron. The use of Micron's Trade Secrets by YMTC results in the reduction of Micron's technological edge, diminution of Micron's investments in its technology, harm to Micron's goodwill, and damage to Micron's relationships with customers and partners who expect unique and innovative products.

168. Micron cannot recover the years of effort, expertise, and investment that went into developing these Trade Secrets. Re-engineering new, proprietary solutions to replace what has

been misappropriated would require months or years of additional research and development, during which Micron would continue to suffer economic harm.

169. Micron seeks civil redress to the full extent of applicable law.

**COUNT I**

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

**(Trade Secret Class No. 1: [redacted] hard mask for etching high aspect-ratio features)**

**(Against All Defendants)**

170. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 169, inclusive, above.

171. Micron brings this claim under the Defend Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 1, [redacted] hard mask for etching high aspect-ratio features, as alleged above.

172. As described in paragraph 128, which is incorporated by reference herein, Trade Secret Class No. 1 consists of confidential and proprietary scientific, technical, economic, and engineering information relating to processes for mass producing 3D NAND memory arrays, including masking structures, for making high-aspect-ratio holes that run vertically through the layers of a 3D NAND chip. Trade Secret Class No. 1 relates to [redacted] hard mask with specific doping concentrations, the specific chemistries and dimensions for forming the hard mask, and the process for removing the [redacted] in the mask.

173. Trade Secret Class No. 1 was used in, or intended for use in, Micron's [redacted] of 3D NAND products [redacted] which is used in, or intended for use in, interstate or foreign commerce.

174. Micron took reasonable measures to keep Trade Secret Class No. 1 secret and confidential, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

175. Trade Secret Class No. 1 derived independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 1 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

176. Defendant Zhu had access to Trade Secret Class No. 1 while employed by Micron and subject to confidentiality obligations. Defendant Zhu was also required to assign to Micron his inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, reduced to practice, or conceived during his employment with Micron.

177. On information and belief, Defendant Zhu improperly acquired, retained, used, disclosed, or provided Trade Secret Class No. 1 for YMTC's benefit.

178. On information and belief, YMTC improperly acquired, used, disclosed, or possessed Trade Secret Class No. 1 for its own benefit.

179. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 1.

180. Defendants performed acts in furtherance of the misappropriation of Trade Secret Class No. 1 in at least the State of Idaho, the United States, and China.

181. Defendants' acts with respect to Trade Secret Class No. 1 were willful and malicious.

182. As a direct and proximate result of Defendants' misappropriation of Trade Secret Class No. 1, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 1.

183. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under 18 U.S.C. § 1836(b)(3)(C).

184. Defendants' wrongful conduct and misappropriation of Trade Secret Class No. 1 will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 1 by Defendants would irreparably harm Micron.

**COUNT II**

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

**(Trade Secret Class No. 2: [redacted] along with specific tool configuration and adjustments, in the wet-nitride exhumation step)**

**(Against All Defendants)**

185. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 184, inclusive, above.

186. Micron brings this claim under the Defend Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 2, [redacted] along with specific tool configuration and adjustments, in the wet-nitride exhumation step, as alleged above.

187. As described in paragraph 134, which is incorporated by reference herein, Trade Secret Class No. 2 consists of confidential and proprietary scientific, technical, economic, and engineering information relating to methods for removing temporary layers in a replacement gate architecture, called sacrificial silicon nitride layers, from the stack of alternating materials in a 3D NAND chip, including information relating to (1) the chemicals to use and the specific conditions (e.g., pressure, temperature) needed to effectively remove the silicon nitride, [redacted] (2) the configuration of the tool, [redacted] and (3) how to use this combination of chemicals and conditions in a way that avoids certain problems or defects in the chip.

188. Trade Secret Class No. 2 was used in, or intended for use in, Micron's [redacted] 3D NAND products [redacted] which is used in, or intended for use in, interstate or foreign commerce.

189. Micron took reasonable measures to keep Trade Secret Class No. 2 secret and confidential, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

190. Trade Secret Class No. 2 derived independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper

means by, other persons who could obtain economic value from its disclosure or use. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 2 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

191. Defendant Zhu had access to Trade Secret Class No. 2 while employed by Micron and subject to confidentiality obligations. Defendant Zhu was also required to assign to Micron his inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, reduced to practice, or conceived during his employment with Micron.

192. On information and belief, Defendant Zhu improperly acquired, retained, used, disclosed, or provided Trade Secret Class No. 2 for YMTC's benefit.

193. On information and belief, YMTC improperly acquired, used, disclosed, or possessed Trade Secret Class No. 2 for its own benefit.

194. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 2.

195. Defendants performed acts in furtherance of the misappropriation of Trade Secret Class No. 2 in at least the State of Idaho, the United States, and China.

196. Defendants' acts with respect to Trade Secret Class No. 2 were willful and malicious.

197. As a direct and proximate result of Defendants' misappropriation of Trade Secret Class No. 2, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust

enrichment is provable, Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 2.

198. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under 18 U.S.C. § 1836(b)(3)(C).

199. Defendants' wrongful conduct and misappropriation of Trade Secret Class No. 2 will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 2 by Defendants would irreparably harm Micron.

**COUNT III**

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

**(Trade Secret Class No. 3: [redacted] CMP of deck plugs)**

**(Against All Defendants)**

200. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 199, inclusive, above.

201. Micron brings this claim under the Defend Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 3, [redacted] CMP of deck plugs, as alleged above.

202. As described in paragraph 138, which is incorporated by reference herein, Trade Secret Class No. 3 consists of confidential and proprietary scientific, technical, economic, and engineering information relating to methods to prevent defects from forming at the [redacted] such as inter-deck plugs, including information relating to a [redacted]

[redacted] and etch techniques for the inter-deck plug [redacted] of the inter-deck plug.

203. Trade Secret Class No. 3 was used in, or intended for use in, Micron's [redacted] 3D NAND products [redacted] which are used in, or intended for use in, interstate or foreign commerce.

204. Micron took reasonable measures to keep Trade Secret Class No. 3 secret and confidential, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

205. Trade Secret Class No. 3 derived independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 3 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

206. Defendant Zhu had access to Trade Secret Class No. 3 while employed by Micron and subject to confidentiality obligations. Defendant Zhu was also required to assign to Micron his inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, reduced to practice, or conceived during his employment with Micron.

207. On information and belief, Defendant Zhu improperly acquired, retained, used, disclosed, or provided Trade Secret Class No. 3 for YMTC's benefit.

208. On information and belief, YMTC improperly acquired, used, disclosed, or possessed Trade Secret Class No. 3 for its own benefit.

209. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 3.

210. Defendants performed acts in furtherance of the misappropriation of Trade Secret Class No. 3 in at least the State of Idaho, the United States, and China.

211. Defendants' acts with respect to Trade Secret Class No. 3 were willful and malicious.

212. As a direct and proximate result of Defendants' misappropriation of Trade Secret Class No. 3, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 3.

213. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under 18 U.S.C. § 1836(b)(3)(C).

214. Defendants' wrongful conduct and misappropriation of Trade Secret Class No. 3 will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 3 by Defendants would irreparably harm Micron.

**COUNT IV**

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

**(Trade Secret Class No. 4: Nonconsumable liners for profile control)**

**(Against All Defendants)**

215. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 214, inclusive, above.

216. Micron brings this claim under the Defend Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 4, nonconsumable liners for profile control, as alleged above.

217. As described in paragraph 143, which is incorporated by reference herein, Trade Secret Class No. 4 consists of confidential and proprietary scientific, technical, economic, and engineering information relating to methods for controlling the shape, or "profile control," of high aspect-ratio holes created during the pillar etch and staircase contact etch in making a 3D NAND chip, [redacted]

218. Trade Secret Class No. 4 was used in, or intended for use in, Micron's [redacted] 3D NAND technology node, which is used in, or intended for use in, interstate or foreign commerce.

219. Micron took reasonable measures to keep Trade Secret Class No. 4 secret and confidential, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

220. Trade Secret Class No. 4 derived independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper

means by, other persons who could obtain economic value from its disclosure or use. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 4 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

221. Defendant Zhu had access to Trade Secret Class No. 4 while employed by Micron and subject to confidentiality obligations. Defendant Zhu was also required to assign to Micron his inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, reduced to practice, or conceived during his employment with Micron.

222. On information and belief, Defendant Zhu improperly acquired, retained, used, disclosed, or provided Trade Secret Class No. 4 for YMTC's benefit.

223. On information and belief, YMTC improperly acquired, used, disclosed, or possessed Trade Secret Class No. 4 for its own benefit.

224. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 4.

225. Defendants performed acts in furtherance of the misappropriation of Trade Secret Class No. 4 in at least the State of Idaho, the United States, and China.

226. Defendants' acts with respect to Trade Secret Class No. 4 were willful and malicious.

227. As a direct and proximate result of Defendants' misappropriation of Trade Secret Class No. 4, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust

enrichment is provable, Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 4.

228. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under 18 U.S.C. § 1836(b)(3)(C).

229. Defendants' wrongful conduct and misappropriation of Trade Secret Class No. 4 will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 4 by Defendants would irreparably harm Micron.

**COUNT V**

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

**(Trade Secret Class No. 5: [redacted] cleaning)**

**(Against All Defendants)**

230. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 229, inclusive, above.

231. Micron brings this claim under the Defend Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 5, [redacted] cleaning, as alleged above.

232. As described in paragraph 147, which is incorporated by reference herein, Trade Secret Class No. 5 consists of confidential and proprietary scientific, technical, economic, and engineering information relating to methods for cleaning certain areas after a process known as the "pillar etch punch," including information related to [redacted] to clean and shape materials [redacted]

[redacted] and performing the cleaning under carefully controlled chamber conditions, including the presence of certain chemicals.

233. Trade Secret Class No. 5 was used in, or intended for use in, Micron's [redacted] 3D NAND products [redacted] which is used in, or intended for use in, interstate or foreign commerce.

234. Micron took reasonable measures to keep Trade Secret Class No. 5 secret and confidential, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

235. Trade Secret Class No. 5 derived independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 5 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

236. Defendant Zhu had access to Trade Secret Class No. 5 while employed by Micron and subject to confidentiality obligations. Defendant Zhu was also required to assign to Micron his inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, reduced to practice, or conceived during his employment with Micron.

237. On information and belief, Defendant Zhu improperly acquired, retained, used, disclosed, or provided Trade Secret Class No. 5 for YMTC's benefit.

238. On information and belief, YMTC improperly acquired, used, disclosed, or possessed Trade Secret Class No. 5 for its own benefit.

239. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 5.

240. Defendants performed acts in furtherance of the misappropriation of Trade Secret Class No. 5 in at least the State of Idaho, the United States, and China.

241. Defendants' acts with respect to Trade Secret Class No. 5 were willful and malicious.

242. As a direct and proximate result of Defendants' misappropriation of Trade Secret Class No. 5, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 5.

243. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under 18 U.S.C. § 1836(b)(3)(C).

244. Defendants' wrongful conduct and misappropriation of Trade Secret Class No. 5 will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 5 by Defendants would irreparably harm Micron.

**COUNT VI**

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

**(Trade Secret Class No. 6: [redacted] bottom pillar sculpting)**

**(Against All Defendants)**

245. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 244, inclusive, above.

246. Micron brings this claim under the Defend Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 6, [redacted] bottom pillar sculpting, as alleged above.

247. As described in paragraph 152, which is incorporated by reference herein, Trade Secret Class No. 6 consists of confidential and proprietary scientific, technical, economic, and engineering information relating to methods for shaping, or "sculpting," certain areas inside the tiny holes—called pillar holes—in a 3D NAND chip, including information related to using specific chemical solutions [redacted] for sculpting and [redacted]

248. Trade Secret Class No. 6 was used in, or intended for use in, Micron's [redacted] 3D NAND products, which are used in, or intended for use in, interstate or foreign commerce.

249. Micron took reasonable measures to keep Trade Secret Class No. 6 secret and confidential, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

250. Trade Secret Class No. 6 derived independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret

Class No. 6 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

251. Defendant Zhu had access to Trade Secret Class No. 6 while employed by Micron and subject to confidentiality obligations. Defendant Zhu was also required to assign to Micron his inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, reduced to practice, or conceived during his employment with Micron.

252. On information and belief, Defendant Zhu improperly acquired, retained, used, disclosed, or provided Trade Secret Class No. 6 for YMTC's benefit.

253. On information and belief, YMTC improperly acquired, used, disclosed, or possessed Trade Secret Class No. 6 for its own benefit.

254. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 6.

255. Defendants performed acts in furtherance of the misappropriation of Trade Secret Class No. 6 in at least the State of Idaho, the United States, and China.

256. Defendants' acts with respect to Trade Secret Class No. 6 were willful and malicious.

257. As a direct and proximate result of Defendants' misappropriation of Trade Secret Class No. 6, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 6.

258. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under 18 U.S.C. § 1836(b)(3)(C).

259. Defendants' wrongful conduct and misappropriation of Trade Secret Class No. 6 will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 6 by Defendants would irreparably harm Micron.

**COUNT VII**

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

**(Trade Secret Class No. 7: Read-offset adjustments via successful read counts)**

**(Against Defendant YMTC)**

260. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 259, inclusive, above.

261. Micron brings this claim under the Defend Trade Secrets Act based on YMTC's misappropriation of Micron's Trade Secret Class No. 7, read-offset adjustments via successful read counts, as alleged above.

262. As described in paragraph 157, which is incorporated by reference herein, Trade Secret Class No. 7 consists of confidential and proprietary scientific, technical, economic, and engineering information relating to methods and configurations for adjusting the read voltage in a 3D NAND chip, including information related to: (1) reading memory cells, [redacted] to determine a read-offset voltage; (2) determining an offset [redacted] and (3) employing different offsets [redacted]

263. Trade Secret Class No. 7 was used in, or intended for use in, Micron's [redacted] 3D NAND products [redacted] which are used in, or intended for use in, interstate or foreign commerce.

264. Micron took reasonable measures to keep Trade Secret Class No. 7 secret and confidential, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

265. Trade Secret Class No. 7 derived independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 7 by accelerating its own chip development, improving the quality of the chips, and improving yield and manufacturing efficiency of the chips.

266. As part of his job duties, former Micron engineer Tan had access to Trade Secret Class No. 7 while employed by Micron China and subject to confidentiality obligations not to disclose trade secrets and confidential information of the Micron Group, including those of the parent company Micron. In addition, Tan's Offer Letter required his compliance with the "general instructions, rules, and regulations" of parent company Micron including any "staff handbook" that Micron may issue. Micron regularly issued Global Handbooks to its employees and those of its subsidiaries and affiliates. The Global Handbooks identified protecting Micron's intellectual property as a core value and that misuse of confidential or proprietary information of a Micron company was unacceptable conduct. The Global Handbooks further provided that

"[t]eam members are responsible for keeping informed of changes to this Global Handbook," and directed employees to access the current version online.

267. On information and belief, Tan improperly acquired, retained, used, disclosed, or provided Trade Secret Class No. 7 for YMTC's benefit.

268. On information and belief, YMTC improperly acquired, used, disclosed, or possessed Trade Secret Class No. 7 for its own benefit.

269. Micron did not consent to or authorize YMTC to acquire, use, disclose, possess, or retain Trade Secret Class No. 7.

270. YMTC performed acts in furtherance of the misappropriation of Trade Secret Class No. 7 in at least the State of Idaho, the United States, and China.

271. YMTC's acts with respect to Trade Secret Class No. 7 were willful and malicious.

272. As a direct and proximate result of YMTC's misappropriation of Trade Secret Class No. 7, Micron has suffered actual damages and YMTC has been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, Micron is entitled to a reasonable royalty to compensate Micron for YMTC's misappropriation of Trade Secret Class No. 7.

273. Micron further seeks exemplary damages against YMTC in an amount up to two times the amount of Micron's actual damages according to proof under 18 U.S.C. § 1836(b)(3)(C).

274. YMTC's wrongful conduct and misappropriation of Trade Secret Class No. 7 will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 7 by YMTC would irreparably harm Micron.

**COUNT VIII**

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**18 U.S.C. § 1836 *et seq.***

**(Trade Secret Class No. 8: Input-output serialization improvement)**

**(Against Defendant YMTC)**

275. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 274, inclusive, above.

276. Micron brings this claim under the Defend Trade Secrets Act based on YMTC's misappropriation of Micron's Trade Secret Class No. 8, input-output serialization improvement, as alleged above.

277. As described in paragraph 162, which is incorporated by reference herein, Trade Secret Class No. 8 consists of confidential and proprietary scientific, technical, economic, and engineering information relating to circuit design techniques and circuit configurations for data serialization for the input-output path of a memory product. Trade Secret Class No. 8 relates to: (1) multistage serialization architecture for NAND/DRAM interfaces; (2) design techniques in view of process, voltage, and temperature effects on output timing windows and power consumption; and (3) [redacted] between serialized data and control signals.

278. Trade Secret Class No. 8 was used in, or intended for use in, products such as Micron's [redacted] products, which are used in, or intended for use in, interstate or foreign commerce.

279. Micron took reasonable measures to keep Trade Secret Class No. 8 secret and confidential, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and

requiring employees with access to such information to sign confidentiality and assignment agreements.

280. Trade Secret Class No. 8 derived independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 8 by accelerating its own chip development, improving the quality of the chips, and improving yield and manufacturing efficiency of the chips.

281. Former Micron engineer Song had access to Trade Secret Class No. 8 while employed by Micron and subject to confidentiality obligations. Song was also required to assign to Micron his inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, reduced to practice, or conceived during his employment with Micron.

282. On information and belief, Song improperly acquired, retained, used, disclosed, or provided Trade Secret Class No. 8 for YMTC's benefit.

283. On information and belief, YMTC improperly acquired, used, disclosed, or possessed Trade Secret Class No. 8 for its own benefit.

284. Micron did not consent to or authorize YMTC to acquire, use, disclose, possess, or retain Trade Secret Class No. 8.

285. YMTC performed acts in furtherance of the misappropriation of Trade Secret Class No. 8 in at least the State of Idaho, the United States, and China.

286. YMTC's acts with respect to Trade Secret Class No. 8 were willful and malicious.

287. As a direct and proximate result of YMTC's misappropriation of Trade Secret Class No. 8, Micron has suffered actual damages and YMTC has been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, Micron is entitled to a reasonable royalty to compensate Micron for YMTC's misappropriation of Trade Secret Class No. 8.

288. Micron further seeks exemplary damages against YMTC in an amount up to two times the amount of Micron's actual damages according to proof under 18 U.S.C. § 1836(b)(3)(C).

289. YMTC's wrongful conduct and misappropriation of Trade Secret Class No. 8 will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 8 by YMTC would irreparably harm Micron.

**COUNT IX**

**Trade Secret Misappropriation Under the Idaho Trade Secrets Act**

**Idaho Code § 48-801, *et seq.***

**(Trade Secret Class No. 1: [redacted] hard mask for etching high aspect-ratio features)**

**(Against All Defendants)**

290. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 289, inclusive, above.

291. Micron brings this claim under the Idaho Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 1, [redacted] hard mask for etching high aspect-ratio features, which included information stored on Micron's servers located in or accessed from Boise, Idaho, as alleged above.

292. As described in paragraph 128, which is incorporated by reference herein, Trade Secret Class No. 1 includes confidential and proprietary scientific, technical, economic, and engineering information used for the development and manufacture of Micron's [redacted] 3D NAND products [redacted] and relates to processes for mass producing 3D NAND memory arrays, including masking structures, for making high aspect-ratio holes that run vertically through the layers of a 3D NAND chip, the use of a [redacted] hard mask with specific doping concentrations, the specific chemistries and dimensions for forming the hard mask, and the process for removing the [redacted] content in the mask.

293. Trade Secret Class No. 1 derives independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secret's disclosure.

294. Micron has taken reasonable measures to protect the secrecy of Trade Secret Class No. 1, including limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees to sign confidentiality and assignment agreements.

295. Defendant Zhu was obligated to keep Trade Secret Class No. 1 confidential, including after the termination of his employment with Micron. He was also required to assign to Micron any inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, or conceived by him, in whole or in part, while employed at Micron. Defendant Zhu improperly retained and used or disclosed such Trade Secrets to YMTC. He performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

296. YMTC improperly acquired and used Trade Secret Class No. 1 for its own benefit. YMTC performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

297. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 1.

298. As a direct and proximate result of violations of Idaho Code § 48-801 by Defendants, Micron has suffered economic damages, including, but not limited to, in Boise, Idaho, in an amount to be proven at trial but exceeding $75,000.

299. The aforementioned acts of Defendants were done willfully and with malice toward Micron.

300. As a result of Defendants' misappropriation of Trade Secret Class No. 1, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, then Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 1.

301. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under Idaho Code § 48-803.

302. The wrongful conduct and misappropriation of Trade Secret Class No. 1 alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business, and it could cause YMTC to have improper advantages, positions, and rights in the market to Micron's detriment. Absent injunctive relief, possession,

disclosure or further use of Trade Secret Class No. 1 by Defendants would irreparably harm Micron.

**COUNT X**

**Trade Secret Misappropriation Under the Idaho Trade Secrets Act**

**Idaho Code § 48-801, *et seq.***

**(Trade Secret Class No. 2: [redacted] along with specific tool configuration and adjustments, in the wet-nitride exhumation step)**

**(Against All Defendants)**

303. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 302, inclusive, above.

304. Micron brings this claim under the Idaho Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 2, [redacted] along with specific tool configuration and adjustments, in the wet-nitride exhumation step, which included information stored on Micron's servers located in or accessed from Boise, Idaho, as alleged above.

305. As described in paragraph 134, which is incorporated by reference herein, Trade Secret Class No. 2 includes confidential and proprietary scientific, technical, economic, and engineering information used for the development and manufacture of Micron's [redacted] 3D NAND products [redacted] including information relating to methods for removing temporary layers in a replacement gate architecture—called sacrificial silicon nitride layers—from the stack of alternating materials in a 3D NAND chip, including exhuming the silicon nitride layers from the 3D memory stack. These Trade Secrets include the chemicals to use and the specific conditions, including pressure and temperature, needed to effectively remove the silicon nitride, [redacted] the configuration of the tool, [redacted]

[redacted] and how to use this combination of chemicals and conditions in a way that avoids certain problems or defects in the chip.

306. Trade Secret Class No. 2 derives independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secret's disclosure. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 2 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

307. Micron has taken reasonable measures to protect the secrecy of Trade Secret Class No. 2, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

308. Defendant Zhu was obligated to keep Trade Secret Class No. 2 confidential, including after the termination of his employment with Micron. He was also required to assign to Micron any inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, or conceived by him, in whole or in part, while employed at Micron. Defendant Zhu improperly retained and used or disclosed such Trade Secrets to YMTC. He performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

309. YMTC improperly acquired and used Trade Secret Class No. 2 for its own benefit. YMTC performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

310. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 2.

311. As a direct and proximate result of violations of Idaho Code § 48-801 by Defendants, Micron has suffered economic damages, including, but not limited to, in Boise, Idaho, in an amount to be proven at trial but exceeding $75,000.

312. The aforementioned acts of Defendants were done willfully and with malice toward Micron.

313. As a result of Defendants' misappropriation of Trade Secret Class No. 2, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, then Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 2.

314. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under Idaho Code § 48-803.

315. The wrongful conduct and misappropriation of Trade Secret Class No. 2 alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business, and it could cause YMTC to have improper advantages, positions, and rights in the market to Micron's detriment. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 2 by Defendants would irreparably harm Micron.

**COUNT XI**

**Trade Secret Misappropriation Under the Idaho Trade Secrets Act**

**Idaho Code § 48-801, *et seq.***

**(Trade Secret Class No. 3: [redacted] Metal CMP of deck plugs)**

**(Against All Defendants)**

316. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 315, inclusive, above.

317. Micron brings this claim under the Idaho Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 3, [redacted] Metal CMP of deck plugs, which included information stored on Micron's servers located in or accessed from Boise, Idaho, as alleged above.

318. As described in paragraph 138, which is incorporated by reference herein, Trade Secret Class No. 3 includes confidential and proprietary scientific, technical, economic, and engineering information used for the development and manufacture of Micron's [redacted] 3D NAND products, including methods to prevent defects from forming at the boundaries of plugs, such as inter-deck plugs, including [redacted] etch techniques for the inter-deck plug [redacted] of the inter-deck plug.

319. Trade Secret Class No. 3 derives independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secret's disclosure. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 3 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

320. Micron has taken reasonable measures to protect the secrecy of Trade Secret Class No. 3, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

321. Defendant Zhu was obligated to keep Trade Secret Class No. 3 confidential, including after the termination of his employment with Micron. He was also required to assign to Micron any inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, or conceived by him, in whole or in part, while employed at Micron. Defendant Zhu improperly retained and used or disclosed such Trade Secrets to YMTC. He performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

322. YMTC improperly acquired and used Trade Secret Class No. 3 for its own benefit. YMTC performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

323. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 3.

324. As a direct and proximate result of violations of Idaho Code § 48-801 by Defendants, Micron has suffered economic damages, including, but not limited to, in Boise, Idaho, in an amount to be proven at trial but exceeding $75,000.

325. The aforementioned acts of Defendants were done willfully and with malice toward Micron.

326. As a result of Defendants' misappropriation of Trade Secret Class No. 3, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, then Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 3.

327. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under Idaho Code § 48-803.

328. The wrongful conduct and misappropriation of Trade Secret Class No. 3 alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business, and it could cause YMTC to have improper advantages, positions, and rights in the market to Micron's detriment. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 3 by Defendants would irreparably harm Micron.

**COUNT XII**

**Trade Secret Misappropriation Under the Idaho Trade Secrets Act**

**Idaho Code § 48-801, *et seq.***

**(Trade Secret Class No. 4: Nonconsumable liners for high-aspect ratio profile control)**

**(Against All Defendants)**

329. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 328, inclusive, above.

330. Micron brings this claim under the Idaho Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 4, nonconsumable liners for high-aspect

ratio profile control, which included information stored on Micron's servers located in or accessed from Boise, Idaho, as alleged above.

331. As described in paragraph 143, which is incorporated by reference herein, Trade Secret Class No. 4 includes confidential and proprietary scientific, technical, economic, and engineering information used for the development and manufacture of Micron's [redacted] 3D NAND technology node, including methods for controlling the shape, or "profile control," of high aspect-ratio holes created during the pillar etch and staircase contact etch in making a 3D NAND chip, [redacted]

332. Trade Secret Class No. 4 derives independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secret's disclosure. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 4 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

333. Micron has taken reasonable measures to protect the secrecy of Trade Secret Class No. 4, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

334. Defendant Zhu was obligated to keep Trade Secret Class No. 4 confidential, including after the termination of his employment with Micron. He was also required to assign

to Micron any inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, or conceived by him, in whole or in part, while employed at Micron. Defendant Zhu improperly retained and used or disclosed such Trade Secrets to YMTC. He performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

335. YMTC improperly acquired and used Trade Secret Class No. 4 for its own benefit. YMTC performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

336. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 4.

337. As a direct and proximate result of violations of Idaho Code § 48-801 by Defendants, Micron has suffered economic damages, including, but not limited to, in Boise, Idaho, in an amount to be proven at trial but exceeding $75,000.

338. The aforementioned acts of Defendants were done willfully and with malice toward Micron.

339. As a result of Defendants' misappropriation of Trade Secret Class No. 4, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, then Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 4.

340. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under Idaho Code § 48-803.

341. The wrongful conduct and misappropriation of Trade Secret Class No. 4 alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business, and it could cause YMTC to have improper advantages, positions, and rights in the market to Micron's detriment. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 4 by Defendants would irreparably harm Micron.

**COUNT XIII**

**Trade Secret Misappropriation Under the Idaho Trade Secrets Act**

**Idaho Code § 48-801, *et seq.***

**(Trade Secret Class No. 5: [redacted] cleaning)**

**(Against All Defendants)**

342. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 341, inclusive, above.

343. Micron brings this claim under the Idaho Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 5 [redacted] cleaning, which included information stored on Micron's servers located in or accessed from Boise, Idaho, as alleged above.

344. As described in paragraph 147, which is incorporated by reference herein, Trade Secret Class No. 5 includes confidential and proprietary scientific, technical, economic, and engineering information used for the development and manufacture of Micron's [redacted] 3D NAND products [redacted] including methods for cleaning certain areas after a process known as the "pillar etch punch," including [redacted] to clean and shape materials [redacted]

[redacted] and performing the cleaning under carefully controlled chamber conditions, including the presence of certain chemicals.

345. Trade Secret Class No. 5 derives independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secret's disclosure. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 5 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

346. Micron has taken reasonable measures to protect the secrecy of Trade Secret Class No. 5, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

347. Defendant Zhu was obligated to keep Trade Secret Class No. 5 confidential, including after the termination of his employment with Micron. He was also required to assign to Micron any inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, or conceived by him, in whole or in part, while employed at Micron. Defendant Zhu improperly retained and used or disclosed such Trade Secrets to YMTC. He performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

348. YMTC improperly acquired and used Trade Secret Class No. 5 for its own benefit. YMTC performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

349. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 5.

350. As a direct and proximate result of violations of Idaho Code § 48-801 by Defendants, Micron has suffered economic damages, including, but not limited to, in Boise, Idaho, in an amount to be proven at trial but exceeding $75,000.

351. The aforementioned acts of Defendants were done willfully and with malice toward Micron.

352. As a result of Defendants' misappropriation of Trade Secret Class No. 5, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, then Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 5.

353. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under Idaho Code § 48-803.

354. The wrongful conduct and misappropriation of Trade Secret Class No. 5 alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business, and it could cause YMTC to have improper advantages, positions, and rights in the market to Micron's detriment. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 5 by Defendants would irreparably harm Micron.

**COUNT XIV**

**Trade Secret Misappropriation Under the Idaho Trade Secrets Act**

**Idaho Code § 48-801, *et seq.***

**(Trade Secret Class No. 6: [redacted] bottom pillar sculpting)**

**(Against All Defendants)**

355. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 354, inclusive, above.

356. Micron brings this claim under the Idaho Trade Secrets Act based on Defendants' misappropriation of Micron's Trade Secret Class No. 6, [redacted] bottom pillar sculpting, which included information stored on Micron's servers located in or accessed from Boise, Idaho, as alleged above.

357. As described in paragraph 152, which is incorporated by reference herein, Trade Secret Class No. 6 includes confidential and proprietary scientific, technical, economic, and engineering information used for the development and manufacture of Micron's [redacted] 3D NAND products, including methods for shaping, or "sculpting," certain areas inside the tiny holes—called pillar holes—in a 3D NAND chip, including information related to using specific chemical solutions [redacted]

358. Trade Secret Class No. 6 derives independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secret's disclosure. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 6 by accelerating chip development, improving chip quality, and improving chip yield and manufacturing efficiency.

359. Micron has taken reasonable measures to protect the secrecy of Trade Secret Class No. 6, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and

requiring employees with access to such information to sign confidentiality and assignment agreements.

360. Defendant Zhu was obligated to keep Trade Secret Class No. 6 confidential, including after the termination of his employment with Micron. He was also required to assign to Micron any inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, or conceived by him, in whole or in part, while employed at Micron. Defendant Zhu improperly retained and used or disclosed such Trade Secrets to YMTC. He performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

361. YMTC improperly acquired and used Trade Secret Class No. 6 for its own benefit. YMTC performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

362. Micron did not consent to or authorize Defendants to acquire, use, disclose, possess, or retain Trade Secret Class No. 6.

363. As a direct and proximate result of violations of Idaho Code § 48-801 by Defendants, Micron has suffered economic damages, including, but not limited to, in Boise, Idaho, in an amount to be proven at trial but exceeding $75,000.

364. The aforementioned acts of Defendants were done willfully and with malice toward Micron.

365. As a result of Defendants' misappropriation of Trade Secret Class No. 6, Micron has suffered actual damages and Defendants have been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable,

then Micron is entitled to a reasonable royalty to compensate Micron for Defendants' misappropriation of Trade Secret Class No. 6.

366. Micron further seeks exemplary damages against Defendants in an amount up to two times the amount of Micron's actual damages according to proof under Idaho Code § 48-803.

367. The wrongful conduct and misappropriation of Trade Secret Class No. 6 alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business, and it could cause YMTC to have improper advantages, positions, and rights in the market to Micron's detriment. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 6 by Defendants would irreparably harm Micron.

**COUNT XV**

**Trade Secret Misappropriation Under the Idaho Trade Secrets Act**

**Idaho Code § 48-801, *et seq.***

**(Trade Secret Class No. 7: Read-offset adjustments via successful read counts)**

**(Against YMTC)**

368. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 367, inclusive, above.

369. Micron brings this claim under the Idaho Trade Secrets Act based on YMTC's misappropriation of Micron's Trade Secret Class No. 7, read-offset adjustments via successful read counts, which included information stored on Micron's servers located in or accessed from Boise, Idaho, as alleged above.

370. As described in paragraph 157, which is incorporated by reference herein, Trade Secret Class No. 7 consists of confidential and proprietary scientific, technical, economic, and

engineering information relating to methods and configurations for adjusting the read voltage in a 3D NAND chip, including: (1) reading memory cells [redacted] to determine a read-offset voltage; (2) determining an offset [redacted] and (3) employing different offsets [redacted]

371. Trade Secret Class No. 7 derives independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secret's disclosure. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 7 by accelerating its own chip development, improving the quality of the chips, and improving yield and manufacturing efficiency of the chips.

372. Micron has taken reasonable measures to protect the secrecy of Trade Secret Class No. 7, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

373. As part of his job duties, former Micron engineer Tan had access to Trade Secret Class No. 7 while employed by Micron China and subject to confidentiality obligations not to disclose trade secrets and confidential information of the Micron Group, including those of the parent company Micron. In addition, Tan's Offer Letter required his compliance with the "general instructions, rules, and regulations" of parent company Micron including any "staff handbook" that Micron may issue. Micron regularly issued Global Handbooks to its employees and those of its subsidiaries and affiliates. The Global Handbooks identified protecting Micron's intellectual property as a core value and that misuse of confidential or proprietary information of a Micron company was unacceptable conduct. In addition, Tan's Offer Letter required his

compliance with the "general instructions, rules, and regulations" of parent company Micron including any "staff handbook" that Micron may issue. Micron regularly issued Global Handbooks to its employees and those of its subsidiaries and affiliates. The Global Handbooks identified protecting Micron's intellectual property as a core value and that misuse of confidential or proprietary information of a Micron company was unacceptable conduct. The Global Handbooks further provided that "[t]eam members are responsible for keeping informed of changes to this Global Handbook," and directed employees to access the current version online.

374. On information and belief, YMTC improperly acquired, used, disclosed, or possessed Trade Secret Class No. 7 for its own benefit. YMTC performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

375. YMTC improperly acquired and used Trade Secret Class No. 7 for its own benefit. YMTC performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

376. Micron did not consent to or authorize YMTC to acquire, use, disclose, possess, or retain Trade Secret Class No. 7.

377. As a direct and proximate result of violations of Idaho Code § 48-801 by YMTC, Micron has suffered economic damages, including, but not limited to, in Boise, Idaho, in an amount to be proven at trial but exceeding $75,000.

378. The aforementioned acts of YMTC were done willfully and with malice toward Micron.

379. As a result of YMTC's misappropriation of Trade Secret Class No. 7, Micron has suffered actual damages and YMTC has been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, then Micron is entitled to a reasonable royalty to compensate Micron for YMTC's misappropriation of Trade Secret Class No. 7.

380. Micron further seeks exemplary damages against YMTC in an amount up to two times the amount of Micron's actual damages according to proof under Idaho Code § 48-803.

381. The wrongful conduct and misappropriation of Trade Secret Class No. 7 alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business, and it could cause YMTC to have improper advantages, positions, and rights in the market to Micron's detriment. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 7 by YMTC would irreparably harm Micron.

**COUNT XVI**

**Trade Secret Misappropriation Under the Idaho Trade Secrets Act**

**Idaho Code § 48-801, *et seq.***

**(Trade Secret Class No. 8: Input-output serialization improvement)**

**(Against YMTC)**

382. Micron repeats, realleges, and incorporates herein by reference the allegations of paragraphs 1 through 381, inclusive, above.

383. Micron brings this claim under the Idaho Trade Secrets Act based on YMTC's misappropriation of Micron's Trade Secret Class No. 8, input-output serialization improvement, which included information stored on Micron's servers located in or accessed from Boise, Idaho, as alleged above.

384. As described in paragraph 162, which is incorporated by reference herein, Trade Secret Class No. 8 includes confidential and proprietary scientific, technical, economic, and engineering information used for the development of Micron's [redacted] products, including circuit design techniques and circuit configurations for data serialization for the input-output path of a memory product. Trade Secret Class No. 8 further includes: (1) multistage serialization architecture for NAND/DRAM interfaces; (2) design techniques in view of process, voltage, and temperature effects on output timing windows and power consumption; and (3) [redacted] between serialized data and control signals.

385. Trade Secret Class No. 8 derives independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secret's disclosure. A semiconductor manufacturer such as YMTC could obtain economic value from Trade Secret Class No. 8 by accelerating its own chip development, improving the quality of the chips, and improving yield and manufacturing efficiency of the chips.

386. Micron has taken reasonable measures to protect the secrecy of Trade Secret Class No. 8, including by limiting access to trade secret information, employing physical and electronic security measures, restricting access to digital files containing trade secrets, and requiring employees with access to such information to sign confidentiality and assignment agreements.

387. Former Micron engineer Song was obligated to keep Trade Secret Class No. 8 confidential, including after the termination of his employment with Micron. Song was also required to assign to Micron any inventions, discoveries, ideas, processes, works of authorship, developments, concepts, and improvements that were made, created, developed, written, reduced

to practice, or conceived by him, in whole or in part, while employed at Micron. Song improperly retained and used or disclosed such Trade Secrets to YMTC. Song performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

388. YMTC improperly acquired and used Trade Secret Class No. 8 for its own benefit, including by directing Song to file, among other filings, a U.S. patent application that relates to the subject matter of Micron's Trade Secrets and confidential information. YMTC performed such acts in furtherance of the trade secret misappropriation in at least the State of Idaho, the United States, and China.

389. Micron did not consent to or authorize YMTC to acquire, use, disclose, possess, or retain Trade Secret Class No. 8.

390. As a direct and proximate result of violations of Idaho Code § 48-801 by YMTC, Micron has suffered economic damages, including, but not limited to, in Boise, Idaho, in an amount to be proven at trial but exceeding $75,000.

391. The aforementioned acts of YMTC were done willfully and with malice toward Micron.

392. As a result of YMTC's misappropriation of Trade Secret Class No. 8, Micron has suffered actual damages and YMTC has been unjustly enriched. Micron pleads in the alternative that, if it is determined that neither actual damages nor unjust enrichment is provable, then Micron is entitled to a reasonable royalty to compensate Micron for YMTC's misappropriation of Trade Secret Class No. 8.

393. Micron further seeks exemplary damages against YMTC in an amount up to two times the amount of Micron's actual damages according to proof under Idaho Code § 48-803.

394. The wrongful conduct and misappropriation of Trade Secret Class No. 8 alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Micron's business, and it could cause YMTC to have improper advantages, positions, and rights in the market to Micron's detriment. Absent injunctive relief, possession, disclosure or further use of Trade Secret Class No. 8 by YMTC would irreparably harm Micron.

**COUNT XVII**

**Declaratory Judgment of Ownership of U.S. Patent No. 11,049,866**

**(Against YMTC)**

395. Micron repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 169 of this Complaint as if fully set forth herein.

396. Micron is the true owner of the '866 Patent by virtue of the Assignment Agreement entered into between Defendant Zhu, one of the named inventors on the '866 Patent, and Micron.

397. Defendant Zhu assigned all right, title, and interest in the claimed invention that is the subject matter of at least claim 1 of the '866 Patent to Micron during his employment at Micron. His assignment predates the priority date of the '866 Patent.

398. Micron holds equitable title to the '866 Patent.

399. As such, Micron seeks declaratory relief that it is the sole and exclusive owner of the '866 Patent or, in the alternative, that it owns a pro rata undivided interest in the '866 Patent, and seeks transfer of legal title from YMTC to Micron.

**COUNT XVIII**

**Declaratory Judgment of Ownership of U.S. Patent No. 11,532,636**

**(Against YMTC)**

400. Micron repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 169 of this Complaint as if fully set forth herein.

401. Micron is the true owner of the ’636 Patent by virtue of the Assignment Agreement entered into between Defendant Zhu, one of the named inventors on the ’636 Patent, and Micron.

402. Defendant Zhu assigned all right, title, and interest in the claimed invention that is the subject matter of at least claim 1 of the ’636 Patent to Micron during his employment at Micron. His assignment predates the priority date of the ’636 Patent.

403. Micron holds equitable title to the ’636 Patent.

404. As such, Micron seeks declaratory relief that it is the sole and exclusive owner of the ’636 Patent or, in the alternative, that it owns a pro rata undivided interest in the ’636 Patent, and seeks transfer of legal title from YMTC to Micron.

## COUNT XIX

## Declaratory Judgment of Ownership of U.S. Patent No. 10,566,336

## (Against YMTC)

405. Micron repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 169 of this Complaint as if fully set forth herein.

406. Micron is the true owner of the ’336 Patent by virtue of the Assignment Agreement entered into between Defendant Zhu, one of the named inventors on the ’336 Patent, and Micron.

407. Defendant Zhu assigned all right, title, and interest in the claimed invention that is the subject matter of at least claim 1 of the ’336 Patent to Micron during his employment at Micron. His assignment predates the priority date of the ’336 Patent.

408. Micron holds equitable title to the ’336 Patent.

409. As such, Micron seeks declaratory relief that it is the sole and exclusive owner of the ’336 Patent or, in the alternative, that it owns a pro rata undivided interest in the ’336 Patent, and seeks transfer of legal title from YMTC to Micron.

**COUNT XX**

**Declaratory Judgment of Ownership of U.S. Patent No. 10,707,851**

**(Against YMTC)**

410. Micron repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 169 of this Complaint as if fully set forth herein.

411. Micron is the true owner of the ’851 Patent by virtue of the Assignment Agreement entered into between Song, one of the named inventors on the ’851 Patent, and Micron.

412. Song assigned all right, title, and interest in the claimed invention that is the subject matter of at least claim 1 of the ’851 Patent to Micron during his employment at Micron. His assignment predates the priority date of the ’851 Patent.

413. Micron holds equitable title to the ’851 Patent.

414. As such, Micron seeks declaratory relief that it is the sole and exclusive owner of the ’851 Patent or, in the alternative, that it owns a pro rata undivided interest in the ’851 Patent, and seeks transfer of legal title from YMTC to Micron.

**COUNT XXI**

**Breach of Contract**

**(Against Defendant Hongbin Zhu)**

415. Micron repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 414 of this Complaint as if fully set forth herein.

416. Through Zhu's Confidentiality Agreement, attached hereto as Exhibit A, Defendant Zhu entered into a binding, valid contractual agreement with Micron that specified all essential and material terms of the parties' agreement.

417. Pursuant to the material and essential terms of the Confidentiality Agreement, Defendant Zhu assumed a duty not to disclose or use any of Micron's confidential information—including trade secrets—except as necessary to perform his job duties for Micron.

418. Pursuant to the Confidentiality Agreement, Micron was required to employ Defendant Zhu. Micron fully performed its duties and obligations under the contractual agreements in that it employed Defendant Zhu from January 9, 2006, to September 15, 2017.

419. In acquiring Micron's confidential and proprietary information, as described above, and retaining and exfiltrating it from Micron for use at another enterprise, Defendant Zhu willfully breached his contractual duty not to disclose Micron's confidential information and trade secrets in violation of his Confidentiality Agreement.

420. As a direct and proximate result of this breach, Defendant Zhu caused damage to Micron in an amount to be determined at trial, together with interest, costs, and attorneys' fees.

**COUNT XXII**

**Breach of Contract**

**(Against Defendant Hongbin Zhu)**

421. Micron repeats, realleges, and incorporates by reference the allegations of paragraphs 1 through 420 of this Complaint as if fully set forth herein.

422. Through the Assignment Agreement, attached hereto as Exhibit B, Defendant Zhu entered into a binding, valid contractual agreement with Micron that specified all essential and material terms of the parties' agreement.

423. Pursuant to the material and essential terms of the Assignment Agreement, Defendant Zhu was also supposed to assign any inventions, discoveries, ideas, processes, works of authorship, development, concepts, and improvements that were made, created, developed, written, or conceived by him, in whole or in part, while employed at Micron, including the work contained in the Trade Secrets.

424. Pursuant to the Assignment Agreement, Micron was required to employ Defendant Zhu. Micron fully performed its duties and obligations under the Assignment Agreement in that it employed Defendant Zhu from January 9, 2006, to September 15, 2017.

425. Defendant Zhu willfully breached his Assignment Agreement because Defendant Zhu did not assign inventions, discoveries, ideas, and other intellectual property to Micron, including the ’866 Patent, the ’636 Patent, and the ’336 Patent.

426. As a direct and proximate result of this breach, Defendant Zhu caused damage to Micron in an amount to be determined at trial, together with interest, costs, and attorneys’ fees.

## V. DEMAND FOR A JURY TRIAL

427. Micron requests a jury trial of all issues in this action that are so triable.

## VI. PRAYER FOR RELIEF

WHEREFORE, Micron respectfully requests that this Court grant the following relief:

(a) A declaration that Defendants have misappropriated Micron’s Trade Secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the Idaho Trade Secrets Act, Idaho Code § 48-801 *et seq.*, and that the misappropriation was willful and malicious;

(b) A declaration that Defendant Zhu has breached the Zhu Confidentiality Agreement and the Zhu Assignment Agreement;

(c) A preliminary and permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from

acquiring, disclosing, using, or possessing Micron's Trade Secrets, and from further misappropriating, using, or disclosing any of Micron's confidential or proprietary information;

(d) A declaration that Micron is the sole and exclusive owner of all right, title, and interest in U.S. Patent Nos. 10,707,851, 11,049,866, 11,532,636, and 10,566,336 (and any other U.S. patents or patent applications assigned to YMTC that were invented by former Micron employees using Micron's confidential information after leaving Micron);

(e) An order compelling YMTC to transfer legal title to the patents identified in paragraph (d) above to Micron;

(f) An award of damages, including compensatory and exemplary damages, for Defendants' misappropriation of Micron's Trade Secrets, in an amount to be proven at trial;

(g) An award of restitution, unjust enrichment, and disgorgement of profits obtained by Defendants as a result of their misappropriation of Micron's Trade Secrets;

(h) An award of reasonable royalties in the alternative to actual damages or unjust enrichment, as permitted by law;

(i) An award of Micron's costs and fees, including reasonable attorney fees associated with this litigation, as permitted by law;

(j) Pre-judgment and post-judgment interest as permitted by law; and

(k) Any other and further relief that the Court deems just and proper.

Dated: September 15, 2026

Respectfully submitted,

*/s/Teague I. Donahey*

Teague I. Donahey (ISB #9963)
tidonahey@hollandhart.com
Christopher C. McCurdy (ISB #8552)
ccmccurdy@hollandhart.com
HOLLAND & HART LLP
800 W. Main Street #1750
Boise, ID 83702-7714
Telephone: +1 208.342.5000

Jared Bobrow (*pro hac vice forthcoming*)
jbobrow@orrick.com
Jason Lang (*pro hac vice forthcoming*)
jlang@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650.614.7400
Facsimile: +1 650.614.7401

**ATTORNEYS FOR PLAINTIFF, MICRON TECHNOLOGY, INC.**